799 A.2d 518

IN THE MATTER OF THE GUARDIANSHIP OF J.N.H., A MINOR.

Argued April 29, 2002—Decided June 26, 2002.

442

444

*Arlene Gilbert Groch* argued the cause for appellant C.H.-P.

*Michele A. Adubato,* Designated Counsel, for Law Guardian, argued the cause for respondent J.N.H., (*Peter A. Garcia,* Acting Public Defender, attorney).

*Ann Marie Seaton,* Deputy Attorney General, argued the cause for respondent New Jersey Division of Youth and Family Services (*Peter C. Harvey,* Acting Attorney General of New Jersey, attorney; *Michael J. Haas,* Assistant Attorney General, of counsel; *Lisa J. Godfrey,* Deputy Attorney General, on the briefs).

The opinion of the Court was delivered by

LONG, J.

C.H. is a mother whose parental rights in respect of her son Jesse, were terminated in 1998 as a result of her inability to overcome her drug and alcohol addictions and provide a safe home for him. She challenges a trial court order that denied her motion, made pursuant to Rule 4:50, to set aside the termination judgment. She contends that her circumstances and those of Jesse have changed dramatically in the four years since her rights were terminated, and that because no adoption has occurred the trial court erred in concluding that those changes did not warrant relief from the judgment under Rule 4:50–1(e) and (f). Because we have concluded that the record provided an inadequate basis on which to determine the motion, we reverse and remand the case to the trial court for further proceedings, the details of which are delineated below.

## I

DYFS became aware of C.H. in November of 1988 when it received a referral from a California Social Services Agency reporting that C.H.'s son, Jeremy, had been declared a dependent child because he tested positive for cocaine at birth. C.H. did not cooperate and tested positive for cocaine before she left California for New Jersey. Concerned for Jeremy and the child with whom C.H. was then pregnant, the California Agency requested "courtesy supervision of the minor and quarterly reports" on C.H.'s progress.

DYFS followed up with a visit. C.H. had married M.P., the father of the child she was carrying. Because C.H. cooperated with its investigation, including drug screening, and expressed regret about her past history, DYFS concluded that the home was appropriate for Jeremy and that he would do well in C.H.'s care. Benjamin was born on May 18, 1989.

In May of 1992, the family left New Jersey for California. Shortly thereafter, C.H. returned with her children and moved in with another man, G.L. Jesse was born in February of 1994. On

January 13, 1995, when Jesse was almost a year old, DYFS received a referral from a friend of C.H. He reported that she was using and selling drugs out of her home; that she yelled and hit the children and had no patience for them; that they were inappropriately dressed for cold weather, and that the baby, Jesse, was sick but had not been taken to the doctor. The results of the DYFS investigation showed that Jesse had received medical attention for an ear infection and that the teachers at school had not noted any problems or concerns for the two older children except that they often seemed hungry. DYFS concluded that intervention was not needed at that time.

On March 10, 1995, DYFS received another referral, that time from a Family Practice physician, who reported that C.H. had failed to bring Jesse in for three follow-up appointments to treat an acute ear infection. When she finally returned with Jesse, the doctor reported that he was concerned that she would not follow up with another of Jesse's medical ailments but that the child was better. At that visit, the doctor confronted C.H. concerning her appearance because he suspected that she was using drugs. C.H. became angry and "stormed around the office."

A DYFS caseworker visited C.H.'s residence on April 3, 1995. C.H. was uncooperative and informed the worker that she was being evicted. The worker was not permitted to enter the house. On April 11, 1995, a caseworker made an unannounced visit to C.H.'s mother's residence where C.H. and her children had relocated. C.H. admitted to the caseworker that she had been arrested with Jesse's father, G.L. and had recently pled guilty to selling drugs. C.H. was sentenced to thirty weekends in jail on the drug charges. While she served her sentence on the weekends, her mother watched her two older children and Jesse went to a babysitter.

On June 15, 1995, DYFS received another referral from a Detective in the Absecon Police Department. C.H. had telephoned the police requesting that they pick up her children from school because she had been in an "accident." The police had also

been informed by neighbors and the landlord that C.H. frequented "drug houses"; that she left Jesse home alone on several occasions; and that when she had enlisted the neighbors' help to watch him, had not returned as promised.

A caseworker interviewed C.H.'s mother, F.H., who stated that her daughter was still using drugs but trying to quit and needed a drug rehabilitation program. C.H.'s mother reported that her bedroom door had been "kicked in" by C.H. and that she had stolen money from her mother who intended to obtain a restraining order against her. The mother informed DYFS that she would be able to care for the two older children, but that she was unable to care for Jesse. Thereafter, more reports were received by DYFS that the children had been found home alone.

On July 7, 1995, C.H. requested that Jesse be put in foster care because there was no one to look after him while she served her weekend jail term. She signed a Foster Home Placement Agreement and Jesse was placed in a foster home on the same day. C.H. periodically contacted DYFS to inform the agency of her status. Caseworkers checked on Jesse in his foster home and noted that he was doing well. On August 7, 1995, Jesse was allowed to visit with his mother and brothers and the caseworker reported that the visit was successful.

On August 16, 1995, C.H. told DYFS that she was residing with a friend and that she wanted Jesse to return to her care upon the completion of her sentence. She was informed that she would need to obtain a stable place to live and be drug and alcohol free in order for Jesse to be returned. When she completed her jail time, C.H. was required to undergo random drug tests and attend Narcotics Anonymous (NA) and Alcoholics Anonymous (AA) meetings three times per week. She told DYFS that she was ready for Jesse's return.

On September 6, 1995, a caseworker visited C.H. at her newly rented two bedroom apartment which was noted to be "very clean." Another DYFS report indicated that C.H. would be getting help from her local church, receiving AFDC, and earning

money by working as a massage therapist. C.H. expressed that she "absolutely wants Jesse home."

After C.H. tested negative for drugs, Jesse was returned to her care on September 8, 1995. In December of that year, C.H. was reporting to probation, attending NA meetings, and the caseworker reported that Jesse "looked great" and was "bright and cheerful." DYFS determined that the family no longer needed its services because Jesse was doing well in his mother's care.

Nevertheless, on April 2, 1996, DYFS received a report that C.H. had left Jesse alone for over an hour and that C.H. was abusing drugs and had left her children in the care of people who were also abusing drugs. On April 10, 1996, a report was received from the Brigantine Police Department that Jesse had been left home alone. When the police arrived they found Jesse alone and asleep in the apartment. The neighbors reported that C.H. was out buying drugs. At that time, there was also an outstanding criminal warrant for her arrest. The police observed that the home was messy, but that Jesse appeared clean and healthy. They took the child into custody and then returned to the residence to wait for C.H. The police charged C.H. with child endangerment.

The DYFS caseworker spoke to C.H. while she was in lock-up. She was "very cooperative and easy to communicate with" and told the caseworker that she had left Jesse with her landlord Mark, who she had asked to babysit. The landlord had admitted to being drunk all day and did not recall being asked to babysit for Jesse.

Jesse received an emergency foster home placement pursuant to *N.J.S.A.* 9:6–8.29 and 9:6–8.30, without a Court Order. DYFS filed a complaint against C.H. alleging abuse and neglect. On April 11, 1996, the trial court entered an Order placing Jesse in the care, custody and supervision of DYFS.

When C.H. was released from jail, she immediately requested a visit with Jesse. The visit was scheduled for April 19, 1996. C.H.

was twenty-five minutes late and the caseworker noted that her eyes were bloodshot. However, the "visit went very well." The caseworker suggested to C.H. that she seek employment, move out of the motel she was staying in, and find an apartment. In the meantime, C.H. was allowed bi-weekly visits with Jesse.

Upon review, the court continued Jesse in the care, custody, and supervision of DYFS and ordered C.H. to accept a referral to the Robin's Nest Family Ties Program (Family Ties), cooperate, follow the recommendations of the staff, submit to drug and alcohol evaluations, including random urine screens, and submit to a psychological evaluation.

Because of complaints by the foster mother about Jesse's behavior, Jesse was moved from his original foster care family to his current foster home in June of 1996. The caseworker reported that Jesse was "adjusting very well" to his new surroundings and observed Jesse "playing appropriately with the other children." C.H. and her other children continued to visit Jesse.

In the meantime, services were provided to C.H. through Family Ties, a therapeutic visitation program, with the intention of ultimately reunifying Jesse with her. Family Ties was responsible for taking Jesse to visit his mother once a week for two hours at C.H.'s mother's residence. The program also addressed C.H.'s alcohol and drug problems, parenting skills, lack of employment and stable housing, and her relationships with her mother and new boyfriend R.N. Stephanie Reel was the family's caseworker from Family Ties.

Thereafter, DYFS received a telephone call from Art Howell, who identified himself as a friend of C.H. He reported that C.H. had asked him to babysit her two older children because her mother was out of town. She left for two days and, on her return to pick up the children, he caught her smoking crack in his bathroom. C.H.'s mother also advised DYFS that her daughter's behavior was strange and that she was neglecting Benjamin and Jeremy.

On August 9, 1996, Jesse's foster mother reported that Jesse had returned from the supervised visits with his mother and Family Ties on two occasions with black eyes. The DYFS caseworker contacted Stephanie Reel, the caseworker from Family Ties. Ms. Reel relayed in her reports that on both occasions she had personally seen Jesse acquire the black eyes when he fell down and that C.H. had responded quickly to comfort and take care of him. Furthermore, a review of Ms. Reel's reports reveals that during those supervised visits there was much affection exhibited between Jesse and his mother.

On September 9, 1996, the DYFS caseworker advised C.H. that she was not following the court-ordered case plan to work towards reunification with Jesse. C.H. asserted that she had not been advised on how to comply with the Order. The caseworker noted that the "record reflects several attempts by previous workers to have these things completed." The caseworker then informed her that she needed to have a drug and alcohol evaluation, a psychological examination, and random drug tests. At that time, C.H. was living on her own at a new address with her two older children.

On September 19, 1996, C.H. had an appointment for an alcohol and drug evaluation at Atlanticare Cornerstone Addiction Services (Atlanticare). At the time of the evaluation, C.H. was thirty-six years old and divorced from M.P., Benjamin's father. She was currently living with her fiance, R.N., and her two older children, Benjamin and Jeremy. She was also employed part time by her fiance, the superintendent of an apartment building, assisting in building maintenance.

At the time of the evaluation, C.H. reported two previously unsuccessful drug and alcohol treatments. She started drinking alcohol at fifteen and using cocaine at nineteen. She had also experimented with various other drugs such as marijuana, amphetamines and hallucinogens. Although her urine screened negative, it was noted that the screening was unsupervised. She was also on probation for her conviction for possession with intent to

distribute in May of 1995. In a letter written by the addictions therapist and clinical coordinator at Atlanticare, it was recommended, based on the results of the evaluation, that C.H. be referred to a "Relapse Prevention Program" meeting twice a week for at least sixteen weeks. In addition, C.H. was to "attend AA/NA meetings and have random urine monitoring." By September 23, 1996, C.H. had failed to supply DYFS with a "random supervised urine screen."

On October 8, 1996, another hearing was held. Once again the court ordered that DYFS maintain care, custody and supervision over Jesse. The court found that Jesse had been abused and neglected within the meaning of N.J.S.A. 9:6–8.21 while in C.H.'s custody and care and ordered that C.H. attend the Relapse Prevention program at Atlanticare. The Court also directed that DYFS maintain care and supervision over Jeremy and Benjamin.

On October 17, 1996, C.H. finally complied with a random supervised drug test and tested positive for cocaine. Subsequently, on November 15, 1996, C.H. was accepted into a substance abuse treatment program at Reality House Inc.

At the request of DYFS, on November 21, 1996, Dr. John Quintana completed a psychological evaluation of C.H. He reported that C.H. was dependent on cocaine and claimed that it "helps 'calm her.'" Dr. Quintana stated that C.H. had experienced an unstable childhood and that "alcohol and drugs have played a dominant part in her life." In addition, Dr. Quintana concluded that C.H. "can be described as having a polysubstance abuse problem which appears to be in partial remission." He noted that she expressed concern for Jesse and wished to have him returned. Dr. Quintana recommended that she adequately address her substance abuse problem before Jesse was allowed to return to her and that she receive individual psychotherapy.

Another hearing was held on December 10, 1996 as a result of which the court ordered that all three children remain in the care of DYFS, that C.H. attend the Relapse Prevention program at Atlanticare and that upon termination of the Family Ties program,

C.H. have supervised visits with Jesse at the Atlantic district office of DYFS every other week.

In the interim, on December 16, 1996, the Family Ties program terminated its services to C.H., reporting that although C.H. claimed she attended the substance abuse program at Reality House and AA meetings, she recently had tested positive for cocaine. She and her two older children had been locked out of their apartment due to numerous arguments she had with her fiancé, R.N. The report also concluded that no progress was made concerning C.H.'s active employment. Family Ties referred C.H. back to Pat Young, the case manager at DYFS, for visitation with Jesse. The Family Ties caseworker stated that "Jesse would be in great danger of neglect if he were to be returned to his mother. The Adoption Resource Center would be beneficial since it would give Jesse permanency and stabilization." It was also recommended that Jesse start speech therapy and that DYFS monitor C.H.'s two older children, Jeremy and Benjamin.

In January of 1997, a client status report from Reality House revealed that C.H. had tested positive for cocaine on December 30, 1996. It was noted that C.H. "denies using and becomes verbally abusive towards staff." The counselor further noted that she "refuses to take responsibility for her actions and blames others for her problems," and "does not appear to be making necessary changes to recover from her chemical dependency issue." It was finally recommended that C.H. be admitted to an in-patient treatment program and upon its completion that she complete the intensive outpatient program. A final report from Reality House in January 1998 revealed that C.H. had discontinued treatment and tested positive for cocaine.

On February 20, 1997, C.H. reported to DYFS that her abusive fiancé had evicted her from the apartment. She and the two older children were living in a shelter in Camden and the children were not attending school. On February 21, 1997, DYFS removed Jeremy and Benjamin from C.H.'s care on an emergency basis and placed the children with C.H.'s mother. On February 24,

1997, DYFS filed a complaint for custody of Jeremy and Benjamin and the Court placed them in the care, custody and supervision of DYFS. DYFS allowed the children to remain with their maternal grandmother. C.H. continued her supervised visits with Jesse. During that time C.H.'s residence was unknown, although she would, on occasion, reside with her mother and her two older children.

Meanwhile, Jesse had been receiving one-hour speech and language therapy sessions weekly while participating in the Early Intervention Program at Children's Seashore House. It was recommended that the Public School Child Study Team evaluate him due to concerns about his speech development. That evaluation resulted in a determination that Jesse was eligible for special education due to his "severe delay in speech and language development and a severe articulation delay." On March 20, 1997, the Child Study Team classified Jesse as Preschool Handicapped.

During the Study Team's interview on March 11, 1997, his foster parents expressed a desire to adopt him. It was also noted, however, that Jesse became very excited when he was shown pictures of C.H., his grandmother and his brothers. He pointed to C.H. in the picture and called her "mommy." "[H]e seemed very happy." The foster mother informed the interviewer that "this was always Jesse's reaction when he sees his mother."

DYFS, once again, advised C.H. to enroll in a substance abuse program. On June 17, 1997, C.H. was accepted into the Family Life Center's substance abuse program and attended her scheduled intake appointment. However, she did not attend the program. She also missed her visitation with Jesse on August 11, 1997.

On August 18, 1997, a little more than one year and four months after he had been placed in the custody and care of DYFS, supervision of Jesse was transferred to the Adoption Resource Center Unit because of C.H.'s long term noncompliance with the court's orders. At that time, Jesse had been residing with his current foster family for a little over one year.

In September 1997, DYFS learned that C.H. had been arrested for violation of probation stemming from her prior conviction of possession with intent to distribute. She was incarcerated and sentenced to the Edna Mahon Correctional Facility for Women in Clinton, New Jersey, where she remained until March 20, 1998. Jesse did not have any visitation with C.H. during her incarceration.

On December 8, 1997, pursuant to *N.J.S.A.* 30:4C–15, DYFS filed an action seeking guardianship of Jesse and terminating C.H.'s parental rights as well as the parental rights of M.P., the legal father, and G.L., the putative father. Both M.P. and G.L. defaulted and their parental rights were terminated, leaving C.H. the only party in interest challenging the DYFS petition. At the time of the 1998 trial, Jeremy was ten years old, and Benjamin was nine. Both resided with their maternal grandmother. Jesse was three and one-half year old and resided with his foster parents.

Patricia Young was the DYFS caseworker in charge of the case from August of 1996 until August of 1997, when the case was transferred to the Adoption Resource Center. She essentially related C.H.'s history as outlined above. Ms. Young stated that C.H. would do "fine for small, for short periods but ... she just doesn't follow through." The witness summarized the services that were provided to C.H. including outpatient counseling, parenting skills, and family preservation visitation programs. Ms. Young also stated that the plan at DYFS had been for C.H. and Jesse to be reunited. However, in August of 1997 DYFS transferred the case to the Adoption Resource Center. When asked why that change in plan occurred, the witness responded:

> Basically I think it was the lack of long term compliance. I mean C.H. would do okay for a little while and then she would be right back where she started again ... There was no consistency with her follow up with programs, with her urine screens, with her outpatient services, with her living arrangement, with her job search. I mean *there was not anything to make us think that she was going to be able to get it together and provide the stability that Jessie needs.* And I think it was that point that we transferred the case to the Adoption Resource Center

because he needs permanency. You know we had worked with C.H. for a very long time.

On cross-examination, Ms. Young admitted that the reports from caseworkers including those from Family Ties indicated that Jesse displayed affection toward his mother during numerous visits and that there was smiling, hugging, and kissing between child and mother.

Connie Mackinnis, a DYFS caseworker employed in the Adoption Resource Center, was assigned the C.H. case on June 6, 1998 and testified on behalf of DYFS. She testified that although C.H. was unable to visit Jesse during her incarceration from September of 1997 until her release in March of 1998, C.H.'s mother had visited Jesse and had brought Jeremy and Benjamin. Despite C.H.'s achievements, Ms. Mackinnis testified that reunification at that time was not a consideration for DYFS and that foster home adoption was still the plan because of C.H.'s history of failure to rehabilitate.

Ms. Mackinnis testified that Jesse was very happy with his foster parents and called them mommy and daddy. However, she also acknowledged that Jesse was excited to see C.H. and that it was fair to say that he loves both his foster parents and C.H. She also explained that long term foster care was not an option for Jesse because of his age; that DYFS "wants children under the age of 12 to be in a permanent home," and therefore, it was determined that adoption is the appropriate plan for Jesse.

During cross-examination, Ms. Mackinnis acknowledged that Jesse got along very well with his brothers and on several occasions, as indicated in the case records, has asked to go home with his mother and showed disappointment when he was not allowed to do so.

C.H. testified on her own behalf. Upon her release on March 20, 1998, C.H. re-enrolled in the Family Life Center intensive outpatient substance abuse program for sixteen months as a probation requirement and also enrolled in the parenting skills program. The "program intensely monitored and supervised [her]

whereabouts at all times and required that she be at home between the hours of 6:00 p.m. and 6:00 A.M." She was also required to complete a minimum of sixteen hours of community service a month, attend three to four NA/AA meetings per week, report to the program twice a week, maintain employment and submit to random urine screens. At the time of trial none of the screens had shown up positive. She also recommenced her visitation with Jesse at the DYFS district office and never missed a visit with two exceptions, neither of her own doing.

She admitted to having had a substance abuse problem. She also testified that she regularly attends church, bible study and a prayer meditation group. C.H. testified that she had been sober since her September 1997 incarceration and was in compliance with her intensive supervision requirements. In addition, she had been working and continued to be employed at Pizza Hut for the past five and one-half months.

However, C.H. acknowledged that she was not prepared to take care of Jesse immediately. Although employed full time at Pizza Hut, twenty-percent of her paycheck went to pay fines and she was still living with her mother. Her hopes of getting her own apartment relied, in large part, on the idea of moving in with her present boyfriend, D.G., who she claimed was helping her out financially. She acknowledged that there had been short periods of time in her life when she was sober. When asked what made this period different, she responded: "Prison. And I sincerely can say that something happened." She testified that it would take no longer than six months for her to prepare for Jesse's return.

Dr. John Quintana, an expert in the field of psychology, testified on behalf of C.H. Dr. Quintana had performed a psychological evaluation on C.H. in 1996 at the request of DYFS pursuant to court order. He also performed a bonding evaluation between C.H. and Jesse on May 18, 1998, and an individual psychological exam of C.H. on June 1, 1998.

The results of the 1998 psychological exam were markedly different from the exam in 1996. The exam consisted of a clinical

interview and the Minnesota Multiphasic Personality Inventory II, a standardized mental status examination. The results of the mental status examination taken in 1996 indicated that C.H. had personality traits consistent with personality disorders and identified her with a group that had a certain amount of "pathology in terms of impulsiveness" as well as "a strong need for self gratification without strong concern for others." Compared to those results, the 1998 examination indicated that C.H. had no identifiable psychological disorders or distress. The 1998 exam also indicated that C.H. was optimistic and self-confident, and was identified with people who "describe themselves as happy, healthy and contented." Dr. Quintana explained that there was a positive change in C.H., that both test results were valid, and that people could change over a course of several years. When asked on cross-examination to what he could attribute the change, Dr. Quintana suggested C.H.'s experience with incarceration and treatment.

The bonding evaluation occurred at the DYFS district office where Dr. Quintana observed the natural interactions of the entire family during a scheduled visit. Dr. Quintana testified:

> [W]hat I found was that Jesse appeared relaxed with the family. He interacted well with his mother, he interacted well with [h]is siblings. He and his mother spontaneously had physical contact. I mean he went to her, she would run to him. They had spontaneous contact with each other. He willingly hugged and kissed his mother. He also played well with his siblings. And the siblings appeared to fully accept him as their brother.

He also noted that Jesse recognized C.H. as his mother, loved her, and seemed well adjusted in his present situation. Dr. Quintana concluded:

> She's shown she's getting treatment and effectively dealing with her addiction. I'm suggesting, recommending that at this point why rush into terminating her parental rights when she is finally at a point right now that she's actually treating her problem?

On cross-examination, Dr. Quintana acknowledged that C.H. was not without problems, but that she was showing marked improvement. When asked if he was concerned with the possibility of relapse on her part, he responded: "Yes. I can't predict, I

cannot predict how she will do. All I can say is right now there are positive signs." He further elaborated that he was much more optimistic about the outcome than he had been in 1996. Throughout his testimony, Dr. Quintana repeated that he was not advocating that Jesse return to C.H.'s care immediately. Rather, he testified that it was premature to terminate her parental rights. He stated that "right now she's on the right road, something I didn't see back when I saw her the first time ... whatever the reason there was some change[ ] ... Jesse seems to be handling this okay. Let's give her some time, see if she can actually sustain these changes."

When asked about his description of the emotional turmoil Jesse would experience if his ties to his family of origin were cut off, he explained that not only would Jesse miss them but he would also be hurt emotionally if he did not see them. He would feel a sense of loss, a life-long loss, and would wonder "what happened to my family." He elaborated that biological relationships are very complex and deeply rooted and that he has learned from his work with older children, such as teenagers who have been adopted or are still in foster care, that they feel an emptiness, a qualitatively different feeling of loss. He predicted that Jesse would be better able to endure the loss of his foster parents than the loss of his family of origin.

Although Dr. Quintana acknowledged that Jesse would feel loss if he were cut off from his foster parents, he explained that there are ways of dealing with that loss, such as by the foster parents maintaining contact so there is continuity, as compared to the severe loss from the termination of parental rights that comes with adoption. Dr. Quintana noted that he was at a disadvantage because he did not evaluate the foster parents' bond with Jesse and vice versa.

Dr. Quintana also noted that Jesse seemed well adjusted under the circumstances, and that in his own mind he has two "mommies," and is working out an arrangement, a survival technique, to emotionally deal with the situation. When asked specifically how

long C.H. should be given to demonstrate her ability to remain sober before Jesse should be returned to her care, Dr. Quintana responded that the drug and alcohol counselors would be a better judge of the time necessary, but suggested six months. In addition, in response to the inquiry regarding Jesse's well being during that time period, Dr. Quintana responded that for the moment Jesse was doing fine and seemed happy and stable, and would not be harmed if permanent placement were postponed.

Dr. Ronald Gruen, an expert in clinical psychology, testified on behalf of DYFS. Dr. Gruen performed a psychological evaluation of C.H. and a bonding evaluation of her and Jesse on July 2, 1998. Dr. Gruen also performed a different objective test called the Millon Clinical Multiaxial Inventory–3 (MCMI–3). The results of the test differed greatly from the results of the test performed by Dr. Quintana. Dr. Gruen's tests indicated that C.H. had a very strong dependence on drugs and alcohol. He concluded that, "given this profile, long-term abstinence, especially in times of stress, is not likely." Furthermore, those results indicated that C.H. had evidenced antisocial, histrionic, and obsessive-compulsive behavior. "She is unlikely to admit responsibility for personal and family difficulties, possessing what may be an easily circumvented conscience."

Dr. Gruen concluded from his clinical evaluation that C.H. was "a glib talker who knows the system." He declared that she was superficially attempting to present herself in the best possible light. "She showed no appreciation of the emotional and psychological impact on her son which her neglect has caused him." According to Dr. Gruen, C.H. failed to show any appreciation for past wrongs and tended to deny or minimize her problems and project responsibility onto others.

The bonding evaluation took place shortly after the psychological evaluation in Dr. Gruen's office. Dr. Gruen noted that Jesse related comfortably with his mother. However, he testified that C.H. "worked very hard to ingratiate herself" with Jesse and made only superficial connections with him. Dr. Gruen further

testified that he did not see a strong and positive psychological bond between the two. He asserted that C.H. was "overly dramatic and superficial in her desire to create the appearance of a strong and positive bond." Dr. Gruen predicted that because Jesse has been out of her care for so long, it is unlikely that he depends on her for gratification of his physical, emotional, or psychological needs. Dr. Gruen further estimated that severance of their relationship would have minimal effect on Jesse's well-being.

Dr. Gruen concluded that C.H.'s current efforts to change her lifestyle, although commendable, were short-lived, superficial, and basically too little and too late with regard to Jesse. He diagnosed her with an "impairment of conscience" and explained that "gratification of self-needs" as a priority will reemerge in her. Dr. Gruen further concluded that because Jesse has special needs and has found stability in his life, it would not be in his best interests to go back to his mother. Dr. Gruen recommended termination of C.H.'s parental rights.

The doctor also performed a bonding evaluation between Jesse and his foster parents, the K's, on August 12, 1998, under the same conditions as the one conducted with C.H. At that time, the K's had been married for eleven years. Ms. K was thirty-one years old and Mr. K was thirty-two years old. They had five children in the home, two biological, ages seven and ten years, one adopted child, age ten, and two other foster children including Jesse. The K's were apparently in the process of adopting the other foster child, a little girl, who was four years old. Ms. K informed Dr. Gruen that she had been a social worker, but when they decided to take in foster children she stopped working. Mr. K owns his own business and reported that they had no financial problems. The family is very active and involved with their church. The K's informed Dr. Gruen that if they adopted Jesse they would not want ongoing contact with Jesse's birth family.

Dr. Gruen noted that Jesse was happy and content calling the K's "mommy" and "daddy." He went to them freely and identi-

fied the other children as his brothers and sisters. The K's were generous with praise for him and he beamed when he received their approval. Dr. Gruen concluded that a "strong and positive psychological bond is developing between these foster parents and this foster child." He also noted that Jesse was thriving in their care and that if the bond were broken he would suffer significant emotional harm. In fact, Dr. Gruen testified that it would be more harmful to sever the bond with the foster parents.

Dr. Gruen further testified that there were many external controls on C.H., and that when those controls are lifted people have a tendency to regress. On the doctor's opinion, that even given C.H.'s current sobriety the court should not wait to see if she continues her recovery to determine whether to terminate her parental rights. He stated: "I don't feel it's advantageous to the child to hold his life in abeyance to see what the results of the experiments are." Moreover, Dr. Gruen testified that he believed it was not likely that C.H. could change but that it was possible. On cross-examination, Dr. Gruen admitted that Jesse was relaxed and comfortable with C.H. He also acknowledged that he never observed Jesse's interaction with his brothers or his grandmother.

The trial court's decision terminating C.H.'s parental rights was rendered in an oral opinion on October 26, 1998. The court summed up C.H.'s history of drug addiction and child care in the following manner:

[DYFS] provided a myriad of services to C.H. including foster care for Jesse, visitation arrangements for C.H., drug and alcohol evaluations, and parenting skills training. Despite these efforts C.H. remained homeless. She found no employment. She continued to use illegal, abuse illegal substances and she lived in and out of various places. C.H. did not cooperate with any programs and was ultimately terminated by all programs. Throughout she remained in denial about her drug problem. She provided no care, comfort or nurturing to Jesse. In all respects she failed to parent Jesse.

The court acknowledged that on release from the Mahon Correctional Facility to the Intensive Supervision Program in March 1998, C.H. was showing signs of improvement but found that, in light of C.H.'s conviction of abuse and neglect pursuant to Title 9,

the circumstances described pursuant to *N.J.S.A.* 30:4C–15(a) had been satisfied.

The court noted that Jesse had been significantly neglected by C.H. due to her addiction problems when he had been in her care. The court also noted that Jesse had been in foster care for more than half of his life. Acknowledging that C.H. appeared willing to try to address her problems and was in compliance with all her intensive supervision program (ISP) requirements, the court also relied on Dr. Gruen's assessment of C.H.'s personality profile and his lack of confidence in her ability to remain sober or maintain a stable lifestyle once the constraints of the (ISP) program were lifted.

With regard to the available alternatives, the court concluded that C.H. was unable to make immediate plans for Jesse's return and that he would likely remain in foster care for at least another year before she would be in any position take him home, an alternative the Court rejected. Moreover, placement of Jesse with his grandmother was not an option because she had informed DYFS that she was capable of caring only for Jeremy and Benjamin.

After reviewing Dr. Quintana's and Dr. Gruen's bonding evaluations, the court concluded that "termination of [C.H.'s] parental rights will not do more harm than good. On the other hand, breaking the bond that has developed between Jesse and the foster parents will certainly do harm." The Court noted that Jesse had been with his current foster parents since June of 1996 and that C.H. "did not begin to stabilize her life until her release from prison on March 20, 1998." The court continued:

> She still has no realistic plans for Jesse's future. And she has no immediate ability to provide the everyday care, supervision, and nurturing that Jesse requires. Instead she argues that the status quo be maintained until she is ready to assume parental responsibility for Jesse.

The court relied heavily on Dr. Gruen's expert testimony, finding him to be a more credible expert whose conclusions coincided with the court's own evaluation of C.H. The court did not find Dr. Quintana to be a reliable expert because he had accepted

"at face value that [C.H.] changed,' without a plausible explanation." Pursuant to *N.J.S.A.* 30:4C–20, the court concluded that DYFS had met its burden by clear and convincing evidence that C.H.'s parental rights should be terminated. The judgment terminating her rights and awarding guardianship of Jesse to DYFS was entered on November 24, 1998.

Subsequent to the trial, on October 18, 1998, C.H. graduated from the Family Life Center after fully completing her treatment program. On November 27, 1998, C.H. was allowed a last visit with Jesse. On January 6, 1999, her attorney filed a notice of appeal from the trial court's decision terminating her parental rights, as well as a Request for Transcripts.

On June 30, 1999, Dr. Quintana wrote a letter in support of C.H.'s application to reinstate her visitation privileges with Jesse. On July 16, 1999, a different trial court denied the application to reinstate C.H.'s parenting time with Jesse, but granted her application that either DYFS or the Office of the Public Defender "pay the costs of the transcripts of the trial necessary for [her] appeal [of the trial court's decision terminating her parental rights]."

However, DYFS and the Office of the Public Defender argued over which agency was responsible for the costs of the transcripts. On February 16, 2000, the appeal was dismissed for lack of prosecution. Finally, on February 24, 2000, the Office of the Public Defender approved payment for the trial transcripts. On March 6, 2000, C.H. filed a motion to reinstate her appeal. The motion was granted on March 24, 2000, and the court ordered that her brief and appendix be filed and served on or before April 28, 2000. Because C.H.'s attorney had still not received all of the trial transcripts, a motion was filed requesting an extension of the deadline for filing the brief. On May 10, 2000, the motion was granted extending the time to May 13, 2000. Unfortunately, the lawyer did not receive the last volume of the trial transcript until June 4, 2000. On June 12, 2000, he hand delivered the brief to the Appellate Division. On July 6, 2000, the Clerk of the Appellate Division rejected the brief pursuant to the Order of the Appellate

Division dismissing the appeal for failure to file the brief in a timely manner.

C.H.'s attorney certified that he was "distressed and depressed at what had happened [and] that [he] avoided C.H. and did not return her phone call messages over the next several months." It was not until January of 2001 that he told her that her appeal had been dismissed. He eventually returned C.H.'s file to her on February 14, 2001. In the meantime, on April 20, 2000, C.H. was granted custody of Jeremy and Benjamin by court order.

In December 2000, Jesse's foster parents informed the caseworker at DYFS, Jacqueline Brousse, that C.H. had been sending letters to them requesting that they consider an open adoption. DYFS directed C.H. to cease contacting the foster family. On February 15, 2001, Jesse's foster father informed DYFS that C.H. had ignored the warning and showed up at their church with her boyfriend. C.H. claimed that a friend had brought her to the church and it was purely coincidental that it was the same church the foster family attends. She had also sent a teddy bear and balloons to their house for Jesse's birthday. Jesse was placed in the temporary care and custody of his foster grandparents because his foster parents were very concerned that C.H. was stalking them and would try to take him. On March 6, 2001, a restraining order was entered against C.H. preventing her from contacting Jesse and his foster family.

Since the termination decision, DYFS has continued to monitor Jesse's adjustment and growth. On February 26, 1999, DYFS reported for the first time that Jesse is a "hyper child." It was also reported on March 16, 1999, that the K's were taking a "family" vacation and needed "vacation placements" for Jesse and April, the other foster child in their care. Apparently, there were problems finding a placement for Jesse while the family was on vacation, but they went away nevertheless. It was also reported that, in April of 1999, Jesse's teacher at the Head Start program noted the following: "Jesse has problems keeping still, attending to tasks and is sometimes a behavior problem. However he is

doing well where his 'studies' are concerned ... Recently he misbehaved so badly in class that [the teacher] had to call Ms. K to come speak with him." In October of 1999, the foster parents needed another vacation placement for Jesse because the rest of the family was going on a "family vacation" to Disneyland for twelve days. Ms. K explained that they were driving to Florida and that it was "too long a drive with small children." (The foster parents have since decided not to adopt the other foster child in the home.)

In a certification submitted by DYFS caseworker, Ms. Brousse, it was relayed that

> [t]o date [May 15, 2001], Jesse remains an emotionally needy child who suffers from speech and language delays requiring him to attend therapy three times per week.... Jesse also attends after school counseling in an effort to deal with his social skills and anger management issues. His emotional rigidity often times prohibits him from handling the smallest of changes effectively. Jesse's foster parents have done an excellent job at meeting his needs, love him as if he were their own and remain committed to adopting him.

On April 4, 2001, C.H. retained new counsel. On April 24, 2001, her counsel filed a motion on behalf of C.H. pursuant to *Rule* 4:50(e) and (f) seeking to vacate the trial court's judgment of guardianship and termination of parental rights and to restrain DYFS from engaging in any adoption proceedings pending resolution of the motion. Due to the motion, efforts toward adoption were placed on hold pending final resolution of the matter. Jesse was seven years old at the time the motion was filed.

C.H.'s criminal sentencing judge submitted a certification noting her improvement since her sentencing. He commented that he last saw her on April 1, 2001 and "[s]he continues to be actively involved in a twelve-step program and demonstrates an abiding commitment to the maintenance of her sobriety." In addition, her therapist at Family Life Center concluded that "no reason exists to assume that [C.H.] could not adequately parent." On April 5, 2001, C.H.'s employer of eight months described her as a "fit, loving, caring and responsible mother" to her sons Benjamin and Jeremy and could think of "no better home or family to place Jesse with." The secretary of the religious education program at

C.H.'s church stated that C.H. has been an Aide in the classroom for at least two years and that she "seems to be very caring and loving with the children in her class and is also very concerned about her own children." Another letter from the school counselor at Jeremy and Benjamin's school found C.H. to "be consistent and conscientious with follow-up for her sons," and noted that the "children are well-taken care of, and maintain good grade-point averages." The Youth Minister at C.H.'s church, who had known her for five-years, stated that she was a "participant in Bible study and book discussion groups," and been "involved in [the church] Junior and Senior Youth Groups for the past 4 years." She further stated that C.H. "provides valuable input and has a lot of good ideas for recreational activities for the kids ... She has a nice way with the kids. She has been loving and supportive yet has no trouble setting limits as to what is acceptable and what is inappropriate and then enforces diplomatically."

C.H. certified that she had been drug and alcohol free since her incarceration in September of 1997, had regained custody of her two older children, both of whom were doing extremely well, had steady employment, and that she was engaged to be married. In addition, she claimed that Jesse was deteriorating in his foster home. She noted that DYFS had reported that he is "emotionally rigid" and that that was in drastic contrast to the development of her two older children in her care. In her view, that was attributable to Jesse's foster family and the decision to terminate her parental rights. She contended that Dr. Gruen's negative predictions regarding her ability to maintain her recovery, which the trial court had relied on in terminating her parental rights, had not materialized. Additionally, she argued that "the prediction was that Jesse will do great if he stays with his foster family but if he were returned to his mother he would not do great. The opposite has happened." C.H. expressed a willingness to allow Jesse a continued relationship with the foster family.

DYFS argued at the motion hearing that to move Jesse from his home would damage him irreparably and that there was no

indication that Jesse's problems were attributable to his relationship with his foster parents. The Guardian Ad Litem agreed.

The court acknowledged C.H.'s assertions that she is sober, employed, works as a volunteer teacher's aid, has resumed custody of Benjamin and Jeremy, and will marry soon. The court noted, however, that Jesse has been living with the foster family for five of his seven years and that prior to the termination proceedings and despite the efforts of DYFS to reunite the family, C.H. had been uncooperative, denied her substance abuse problem, and had not provided care and nurturing to Jesse during that time. "Now [C.H.] comes before the Court and says, look, I've made this dramatic change in my life." *Ibid.* The court stated:

> In another context somebody said to me ... that's like throwing strikes after the game is over. And that's the way it has to be. C.H. may be throwing strikes one after another but the game is over. It ended in November of 1998. Jesse has spent five years in the same foster home. Certainly at this point in time the [c]ourt is not in a position to consider removing him from that foster home despite all the progress that the mother has supposedly made.

The court found that Jesse is not "failing" although he was not doing as well as hoped. "Whether his problems are attributable to neglect he suffered in his first couple of years or to the care he receives from his foster family is unknown," but the court assumed that when Jesse first joined his foster family he would "not necessarily [have been] a healthy child."

Although acknowledging that if the 2001 information was available in 1998 the outcome might have been different, the court concluded that it was the right decision at the time based on the evidence presented. The court also stated that it "suspected" that due to the length of time Jesse has been with his foster family he has bonded with them, but due to separation, has no attachment to C.H. or his half brothers, Jeremy and Benjamin. The court rejected C.H.'s request for a psychological evaluation of Jesse to ascertain his current condition and the cause of his post-termination problems and entered an order denying the motion.

On August 9, 2001, C.H. filed a motion in the Appellate Division to vacate the July 2000 dismissal of her appeal, to stay Jesse's

adoption proceedings, and to reinstate visitation. The Appellate Division granted the motion to reinstate the appeal and to stay the adoption proceedings. The motion for visitation was denied. C.H. also appealed the trial court's decision denying her *Rule* 4:50 motion. Both appeals were consolidated and affirmed in a brief opinion on December 5, 2001.

The Appellate Division stated that it was unable to conclude that the trial court's decision to terminate C.H.'s parental rights "was not the product of [ ] careful, conscientious consideration of the evidence then before [the judge] and findings of facts and conclusions of law based thereon or that it was clearly mistaken or so plainly unwarranted as to require our intervention." *Id.* at 4–5 (citing *Rova Farms Resort, Inc. v. Investors Ins. Co. of Am.*, 65 *N.J.* 474, 483–84, 323 *A.*2d 495 (1974)). Regarding the trial court's decision denying C.H.'s *Rule* 4:50 motion, the court affirmed stating: "We cannot assert our personal concerns upon the judge's evident, careful and thoughtful exercise of his discretion in denying appellant's motion." C.H. petitioned this Court for certification. The petition was granted solely on the *Rule* 4:50 application. *In re Guardianship of J.N.H.*, 171 *N.J.* 445, 794 *A.*2d 184 (2002).

II

C.H. argues that the "facts of the case and the Court's mandate to achieve equity and justice justify relief under *Rule* 4:50(e) and (f) from both the operation of the Final Judgment and the post-trial denial of visitation pending appeal." She asserts that "post-termination events [have] rendered it no longer equitable to keep [Jesse] separated from his entire birth family" because " 'the underlying basis for the judgment had been satisfied' " and because enforcement of the judgment "would be unjust, oppressive, and inequitable." C.H. further contends that her sobriety for the past four years and seven months, her success at raising her two other children, and her contributions to society directly controvert the predictions of DYFS and its expert, Dr. Gruen.

C.H. also alleges that serious harm has been done to Jesse, "changing him from the child who was happy, thriving and content in 1998, to the angry, socially, emotionally, educationally and behaviorally maladjusted child he is today." She points out specific DYFS reports revealing Jesse's current problems, and questions the foster family's decision to take vacations, leaving Jesse behind with DYFS responsible for finding him a respite placement while they were gone. She further argues that it is undisputed that there was a significant bond between Jesse and his brothers, Jeremy and Benjamin, and that reunification of the biological family would benefit all involved.

According to C.H., she has done everything she was required to do in order to be reunited with her son and that she would be happy to provide visitation with the foster family "if they and [Jesse] so desire." Finally, she requests that DYFS be ordered to provide "psychological evaluations and family therapy necessary to assure that Jesse's reunification with his birth family is achieved with the minimal possible additional trauma."

DYFS counters that C.H.'s application pursuant to *Rule* 4:50(e) and (f) offers no exceptional circumstances to justify vacating the judgment of guardianship, and that the unlimited application of *Rule* 4:50 to judgments of guardianship "nullifies New Jersey's long and profound history recognizing that the best interest of children mandates that permanency and finality remain the paramount goals of any guardianship proceeding." DYFS asserts that the need for permanency and stability in a child's life is the central factor in a court's determination to terminate parental rights. According to DYFS, permanency in Jesse's life has been delayed due to the postponement of the adoption process as a result of the present litigation.

DYFS further contends that C.H. "has failed to demonstrate that her self-reported rehabilitation constitutes 'exceptional circumstances' of such magnitude that their existence would make the enforcement of the judgment of guardianship 'unjust, oppressive or inequitable,' " and that removing Jesse from the only

family he has ever known would ignore his best interests "in light of the psychological bond with his foster parents." DYFS urges that Jesse's present problems are not the fault of his foster parents but of his prior neglect and present situation.

Because the need for permanency and the liberal application of *Rule* 4:50 are at odds, DYFS asks the Court to limit the time frame in which a party may file for relief from a judgment of guardianship to "45 days after the entry of the order and that such relief be granted only upon a showing by clear and convincing evidence of fraud, misrepresentation or other misconduct of an adverse party."

Jesse's law guardian makes many of the same arguments as DYFS, focusing on Jesse's best interests and more particularly, his need for stability and the potential for harm if he is removed from the only home he has known for the last six years.

## III

The focus of a termination proceeding is the "best interests" of the child. Because the parents have a constitutional right to enjoy a relationship with their children, however, any decision to terminate that right must satisfy strict standards. *In re Adoption of Children by L.A.S.*, 134 *N.J.* 127, 132–35, 631 *A.*2d 928 (1993). Additionally, parental rights are not absolute and are tempered by the State's *parens patriae* responsibility to protect the welfare of children. *In re Guardianship of K.H.O.*, 161 *N.J.* 337, 347, 736 *A.*2d 1246 (1999). In particular, "parental fitness is the key to determining the best interests of the child in parental rights termination cases." *In re Guardianship of B.L.A.*, 332 *N.J.Super.* 392, 402, 753 *A.*2d 770 (Ch.Div.2000).

Pursuant to *N.J.S.A.* 30:4C–15.1(a), termination of parental rights is warranted when:

(1) The child's health and development have been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of

permanent placement will add to the harm. Such harm may include evidence that separating the child from his foster parents would cause serious and enduring emotional or psychological harm to the child;

(3) [DYFS] has made diligent efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[See *New Jersey Div. of Youth & Family Servs. v. A.W.,* 103 *N.J.* 591, 604–611, 512 *A.*2d 438 (1986) (describing and analyzing each prong).]

Appellate review of a trial court's decision to terminate parental rights is limited, and the trial court's factual findings "should not be disturbed unless they are so wholly unsupportable as to result in a denial of justice." *In re Guardianship of J.T.,* 269 *N.J.Super.* 172, 188, 634 *A.*2d 1361 (App.Div.1993); (quoting *Rova Farms Resort, Inc. v. Investors Ins. Co. of America,* 65 *N.J.* 474, 483–84, 323 *A.*2d 495 (1974)); *In re Adoption of Child by P.S.,* 315 *N.J.Super.* 91, 107, 716 *A.*2d 1171 (App.Div.1998) (noting that appellate courts should defer to trial court's findings of fact unless they are not supported by "substantial, credible evidence")

■ It is pursuant to those principles that the judgment of termination was entered in this case. In light of C.H.'s long-term lack of sobriety, her failures at rehabilitation, her neglect and inability to provide Jesse a safe home, and what appeared to be a pending adoption by foster parents to whom Jesse had bonded, we are satisfied that the trial court did not abuse its discretion in entering the 1998 termination order based on the application of *N.J.S.A.* 30:4C–15.1 to the record before it. It is for that reason that certification was limited to the issues arising out of *Rule* 4:50 motion.

## IV

■ *Rule* 4:50–1 provides:

On motion, with briefs, and upon such terms as are just, the court may relieve a party or the party's legal representative from a final judgment or order for the following reasons: (a) mistake, inadvertence, surprise, or excusable neglect; (b) newly discovered evidence which would probably alter the judgment or order and which by due diligence could not have been discovered in time to move for a new trial under R. 4:49; (c) fraud (whether heretofore denominated intrinsic or extrin-

sic), misrepresentation, or other misconduct of an adverse party; (d) the judgment or order is void; (e) the judgment or order has been satisfied, released or discharged, or a prior judgment or order upon which it is based has been reversed or otherwise vacated, or *it is no longer equitable that the judgment or order should have prospective application;* or (f) *any other reason justifying relief from the operation of the judgment or order.*

[*R.* 4:50 (emphasis added).]

It is within the trial court's sound discretion, guided by equitable principles, to decide whether relief should be granted pursuant to *Rule* 4:50–1. *Housing Auth. v. Little,* 135 *N.J.* 274, 283, 639 *A.*2d 286 (1994). That decision "will be left undisturbed unless it represents a clear abuse of discretion." *Ibid.*

■ A motion to vacate a judgment pursuant to subsection (e) "on the ground that it is no longer equitable that the judgment should have prospective application must be supported by *evidence of changed circumstances.*" *Id.* at 285, 639 *A.*2d 286 (emphasis added). The moving party "bears the burden of proving that events have occurred subsequent to the entry of a judgment that, absent the relief requested, will result in 'extreme' and 'unexpected' hardship.'" *Ibid.* That requirement is necessary to outweigh the courts' interest in the "finality of judgments." *Id.* at 286, 639 *A.*2d 286.

■ In applying subsection (f) we have stated that "[t]he very essence of (f) is its capacity for relief in exceptional situations. And in such exceptional cases its boundaries are as expansive as the need to achieve equity and justice." *Ibid.* (quoting *Court Inv. Co. v. Perillo,* 48 *N.J.* 334, 341, 225 *A.*2d 352 (1966)); see also *Manning Eng'g, Inc. v. Hudson County Park Comm'n,* 74 *N.J.* 113, 122, 376 *A.*2d 1194 (1977)(stating that courts have authority under subsection (f) to grant relief where it is "necessary to achieve a fair and just result"). Similar to subsection (e), because of the importance in the finality of judgments, relief under subsection (f) is available only when "truly *exceptional circumstances* are present." *Housing Auth., supra,* 135 *N.J.* at 286, 639 *A.*2d 286 (citing *Baumann v. Marinaro,* 95 *N.J.* 380, 395, 471 *A.*2d 395 (1984))(emphasis added). Regardless of the basis, vacation of a

judgment under *Rule* 4:50-1 should be granted sparingly. Pressler, *Current N.J. Court Rules,* comment 1.1 on *R.* 4:50-1 (2001).

█ "The broad reach of the Rule is designed to encompass a limitless variety of factual situations...." *Housing Auth., supra,* 135 *N.J.* at 289, 639 *A.2d* 286. Whether exceptional circumstances exist is determined on a case by case basis according to the specific facts presented. *Baumann, supra,* 95 *N.J.* at 395, 471 *A.2d* 395 ("No categorization can be made of the situations that would warrant redress under subsection (f). Thus, strict bounds should never confine its scope.") (internal quotation marks and citation omitted). Among the factors to be taken into account on a Rule 4:50 motion are the "extent of the delay in making the application for relief, the underlying reason or cause, fault or blamelessness of the litigant, and any prejudice that would accrue to the other party." *C.R. v. J.G.,* 306 *N.J.Super.* 214, 241, 703 *A.2d* 385 (1997).

█ There is nothing in the language of *Rule* 4:50 that would preclude its applicability to a termination of parental rights case, and our courts have, in fact, identified the rule as the source of equitable relief in such cases. *New Jersey Div. of Youth & Family Servs. v. T.J.B.,* 338 *N.J.Super.* 425, 769 *A.2d* 1071 (2001) (reversing order denying motions to set aside final judgment terminating parental rights); *S.R. v. New Jersey Div. of Youth & Family Servs.,* 311 *N.J.Super.* 431, 435-36, 710 *A.2d* 542 (1998) (refusing to modify guardianship order because no clear showing of error or denial of a fair opportunity to be heard); *see also In re Adoption of a Child of Indian Heritage,* 111 *N.J.* 155, 184, 543 *A.2d* 925 (1988) (recognizing applicability of *Rule* 4:50 to judgment of adoption).

█ On a *Rule* 4:50 motion, the need to achieve equity and justice always is balanced against the state's legitimate interest in the finality of judgments. *Manning Eng'g, supra,* 74 *N.J.* at 120, 376 *A.2d* 1194; *C.R., supra,* 306 *N.J.Super.* at 242, 703 *A.2d* 385. Where the future of a child is at stake, there is an additional

weight in the balance: the notion that stability and permanency for the child are paramount. *K.H.O., supra,* 161 *N.J.* at 357–58, 736 *A.*2d 1246. Thus, in determining a *Rule* 4:50 motion in a parental termination case, the primary issue is not whether the movant was vigilant in attempting to vindicate his or her rights or even whether the claim is meritorious, but what effect the grant of the motion would have on the child.

Unlike DYFS, we would not impose an arbitrary time limit on the exercise of a litigant's *Rule* 4:50 rights in these circumstances because such a limit runs counter to any concept of applying equity and justice and would essentially eviscerate sections (e) and (f) of the Rule. Nevertheless, we recognize that the passage of time in a parental termination case, especially where a child has successfully adjusted to a long term placement, is of much greater significance than it would be in practically any other context. It goes without saying that a completed adoption would constitute an additional heavy weight against *Rule* 4:50 relief. That is the backdrop of our inquiry.

V

We turn now to the facts of this case. On C.H.'s *Rule* 4:50 motion, she established that she was blameless for the delay in challenging the 1998 termination judgment. Further, the court received into evidence a series of certifications from C.H., her sentencing judge, her therapist, her employer, representatives of her church and a counselor from Jeremy and Benjamin's school. Together they presented a full and detailed picture of C.H. as having, over the prior four years, literally turned her life around; forswearing drugs and alcohol; working full time; assuming custody of her two other sons who were thriving; being active in church, participating in counseling, and being about to remarry. Most importantly, she was prepared to take custody of Jesse, who all parties agreed, was not doing as well as had been hoped. Contrary to Dr. Gruen, who in 1998 said Jesse was "thriving" in his foster home, in 2001, his caseworker characterized him as

"emotionally rigid" and "needy" and requiring "anger manage-
ment." According to the trial court, there was "nothing in the
record to contradict" the evidence produced by C.H.—"nobody
challenged the representations of C.H." Yet, it ruled against her
for several reasons that we consider problematic.

The first reason appears to be that the original deci-
sion was correct when rendered. That is not a legitimate basis for
denial of a *Rule* 4:50 motion. The very purpose of a *Rule* 4:50
motion is not, as in appellate review, to advance a collateral attack
on the correctness of an earlier judgment. Rather, it is to explain
why it would no longer be just to enforce that judgment. The
issue is not the rightness or wrongness of the original determina-
tion at the time it was made but what has since transpired or been
learned to render its enforcement inequitable. The trial court's
baseball metaphor (that C.H. was "throwing strikes" after the
game was over) belied a misconception about the purpose of a
*Rule* 4:50 motion and revealed a lens focused on the wrong issue.

The second reason relied on by the court was that it continued
to believe Dr. Gruen over Dr. Quintana, as it had at the original
hearing in 1998. More particularly, the court said Dr. Quintana
had not fully explained how, between the first evaluation in 1996
and the second in 1998, C.H. could have undergone the character
changes he found her to be exhibiting when he testified. On the
contrary, it accepted the conclusions of Dr. Gruen, who projected
that C.H.'s changes were "superficial" and "would not last," that
"long-term abstinence is not likely," and that "gratification of self-
need will emerge." It might well have been appropriate in 1998
for a careful court to accept Dr. Gruen's experientially based
opinion (i.e., that people who fail at rehabilitation on numerous
occasions are unlikely to succeed in the future). By 2001, howev-
er, the Court knew that Dr. Gruen's projections were wrong and
Dr. Quintana's were on the mark. In 2001, any objective observer
would have questioned the continuing vitality of Dr. Gruen's
expert opinion regarding the need to terminate C.H.'s parental
rights, which the passage of time and C.H.'s long-term change,

had undermined. Yet no such scrutiny took place. The trial court simply reiterated its faith in Dr. Gruen's disproved projections. At the very least, Dr. Gruen should have been recalled to state whether C.H.'s rehabilitation would alter his original view.

A greater concern is the fact that, although Jesse's present emotional condition and his connections with the parties in this case is the pivotal issue, the court also refused an updated evaluation of him. Instead the Court asserted that it "suspected" that if there were evaluations, they would demonstrate that Jesse's only bonding was in the foster home and that he has no attachments to his mother and brothers. The court further stated that whether the cause of Jesse's present emotional problems is the foster family or prior neglect is "unknown." It seems to us that Jesse's emotional status and the etiology of his condition required explication before the *Rule* 4:50 motion was determined. Given that all parties conceded that Jesse was experiencing problems, his mental and emotional state should have been the point of departure. Instead, it was omitted altogether.

From this record, it is not possible to conclude that Jesse has been provided with stability in a long-term placement and that no concerns about his adjustment have been advanced. Legitimate issues about Jesse's emotional state surfaced and yet no evidence relative to the present relationship of Jesse and his foster parents was proffered at all. Scrutiny of the foster family was elided. On this record, they are shadow figures. At the very least, the court should have inquired further into the troubling issue of the foster parents' refusal, twice, to take Jesse on a "family" vacation and its recent change of heart in connection with the other foster child that it had previously committed to adopt.

Moreover, we note that if C.H. were granted custody of Jesse, she is willing to allow him to continue in a relationship with his foster family, but that the foster family has imposed, as a condition of adoption, a complete severance of any connection between Jesse and his now intact birth family. In light of that develop-

ment, the trial court should have reconsidered the fourth prong of
*A.W., supra,* 103 *N.J.* at 610–11, 512 *A.*2d 438.

■ As the Court has stated, the risk to children stemming
from the deprivation of the custody of their natural parent inheres
in the termination of parental rights and is based on the para-
mount need the children have for permanent and defined parent-
child relationships. *In re Guardianship of J.C.,* 129 *N.J.* 1, at 26,
608 *A.*2d 1312 (1992). "Therefore, the fourth prong of the best
interests test standard cannot require a showing that no harm will
befall the child as a result of the severing of the biological ties.
The question to be addressed under that prong is whether, after
considering and balancing the two relationships, the child will
suffer greater harm from the termination of ties with her natural
parents than from permanent disruption of her relationship with
her foster parents." *K.H.O.,* supra, 161 *N.J.* at 355, 736 *A.*2d
1246.

■ That is an expert judgment. *J.C., supra,* 129 *N.J.* at 19–
22, 608 *A.*2d 1312. Yet the experts in this case were not called on
to reevaluate the situation in light of the changes undergone by
C.H. and Jesse, and in light of C.H.'s willingness to allow Jesse to
sustain a relationship with the foster family in the face of the
foster family's refusal to do the same. Realistically it is hard to
imagine that Jesse would not benefit from two separate reservoirs
of love and support, which is the option being offered by C.H. and
denied by the foster family. Part and parcel of such an inquiry
should be the effect of permanently terminating Jesse's connection
to his siblings, an issue that Dr. Quintana earmarked as having
long-term ramifications for Jesse. *See In re Adoption of Child by
W.P.,* 163 *N.J.* 158, 198, 748 *A.*2d 515 (2000) (describing relation-
ship between siblings as a "blood relationship[ ] that the Legisla-
ture has determined [to] have special importance"); *L. v. G.,* 203
*N.J.Super.* 385, 391–98, 497 *A.*2d 215 (1985) (describing extensive-
ly unique importance of siblings); William Wesley Patton, *The
Status of Sibling's Rights: A View Into the New Millennium,* 51
*DePaul L.Rev.* 1, 26 (2001).

In short, we are not satisfied that the trial court had sufficient evidence before it to decide the *Rule* 4:50 motion. C.H. presented a case warranting further evaluation. At a minimum, an updated psychological evaluation of Jesse including bonding was required, along with an objective assessment of the expert reports on which the original judgment of termination was based. That should have included an opportunity for those experts to reconsider the situation in light of what had occurred in the interim. We thus reverse and remand for further proceedings consonant with the views we have expressed.

The trial court should accept, in addition to the expert evidence to which we have adverted, any other evidence offered by the parties that would bear on the question of whether the Rule 4:50 motion should be granted. Obviously *N.J.S.A.* 30:4C–15.1(a) is the standard against which the evidence should be assessed to determine whether the judgment of termination continues to be a just and equitable outcome. The matter should be completed and an opinion rendered within 120 days.

## VI

Judgments that terminate parental rights profoundly affect the long-term well-being of the children at issue. The strong judicial interest in protecting children and preserving the stability of their foster-care arrangements, and in many cases their ultimate adoption, counsels against permitting collateral attacks on such judgments except in rare cases. This is such a case. The confluence of events confronting us is unique. In virtually all of the termination cases that we have reviewed, the evidence of the challenging parent's rehabilitation has been insubstantial. Concomitantly, rarely, if ever is the child's adjustment to the foster home an issue. Coupled with her blamelessness for the delay in the adjudication of her challenge, C.H. has presented a compelling case for consideration under *Rule* 4:50.

We note, however, that despite C.H.'s unrebutted evidence of her own rehabilitation, if there had been no suggestion that Jesse

was experiencing problems, we would not likely have interfered with the denial of the *Rule* 4:50 motion. This case is not about C.H., who by her prior actions is wholly responsible for the position in which she finds herself. It is about Jesse who has not yet been adopted; who is not doing as well as had been hoped in his foster home; whose adoption by his foster parents is conditioned on his having no further social contact with his mother and his brothers; and whose mother desires to reunite him with his siblings and to allow a continued relationship with his foster family. It is only our abiding concern for Jesse's long-term well-being and our reservation in respect of the issue whether termination will do more harm than good in these circumstances that impels the continuation of these proceedings. In furtherance of the goal of finality for Jesse, we have retained jurisdiction of this very unusual case.

## VII

The judgment of the Appellate Division is reversed. The matter is remanded to the trial court for proceedings in accordance with this opinion.

*For reversal and remandment*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO, LaVECCHIA, and ZAZZALI—7.

*Opposed*—None.