# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1898-17T3

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

     Plaintiff-Respondent,

v.

Y.C.,

     Defendant-Appellant,

and

J.P. and J.T.,

     Defendants.

_____

IN THE MATTER OF THE GUARDIANSHIP
OF J.C., B.C., and Br.C.,

     Minors.

_____

Submitted October 16, 2018 – Decided October 26, 2018

Before Judges Yannotti and Natali.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Ocean County, Docket No. FG-15-0048-17.

Joseph E. Krakora, Public Defender, attorney for appellant Y.C. (Thomas G. Hand, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa Dutton Schaffer, Assistant Attorney General, of counsel; Joshua P. Bohn, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Melissa R. Vance, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Y.C. (Yvonne) appeals from a December 12, 2017 Family Part order terminating her parental rights to her twin daughters B.C. (Betty) and BR.C. (Barbara) and her son J.C. (Jon).[1] The children's respective fathers, J.T. (James) and J.P. (Jordan), have not appealed the termination of their parental rights. Yvonne argues that the Division of Child Protection and Permanency (Division) did not prove all four prongs of the statutory "best interests of the child" test under N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence. The Law Guardian supported termination in the trial court and joins the Division in urging

---

[1] We use fictitious names to protect the parties' privacy and for ease of reference.

A-1898-17T3

us to affirm. Having considered defendant's arguments in light of the record and applicable legal principles, we affirm.

## I.

From 2006 to 2015, the Division received seven referrals related to the family, four involving Yvonne. In 2011, the Division substantiated Yvonne for inadequate supervision of Betty, Barbara and Jon after which the children's maternal grandmother A.A. (Ava) was granted legal custody. When Ava died in August 2015, the children were returned to Yvonne's care.

In January 2016, officers from the Ocean County Sheriff's Office and Toms River Police Department attempted to serve probation warrants on Yvonne at the home where she and the children were residing. Yvonne fled through the back door and the officers entered the home because they heard "blood curdling screams" coming from the children whom Yvonne left behind, unattended and unsupervised.

The police requested the Division's assistance and when caseworkers arrived they contacted Yvonne's relatives to take custody of the children. Because none of Yvonne's relatives were willing or capable of caring for the children and as Yvonne had fled the home and would soon be incarcerated on

A-1898-17T3

child endangerment charges, the Division executed a Dodd[2] removal of Betty, Barbara and Jon.

Throughout 2016, the Division arranged supervised visitation between Yvonne and her children. From January to February 2016, Yvonne was inconsistent with her attendance at the visitations. She eventually stopped contacting the Division.

In February 2016, Yvonne was involuntarily committed to a mental institution after communicating suicidal ideations and an interest in killing her biological father. Yvonne also admitted that she again was using heroin and cocaine. Yvonne further stated that she had no desire to live and that her children did not motivate her enough to continue living. She was released from the mental institution on February 22, 2016.

Yvonne was incarcerated again in March 2016 and remained in jail through June 2016. During her incarceration, the Division provided visitation between Yvonne and the children and also arranged for a psychological evaluation with Dr. Robert Puglia. Dr. Puglia recommended Yvonne participate in therapeutic visitation, parenting classes, an updated substance abuse

---

[2] A "Dodd removal" refers to the emergency removal of a child from a home without a court order as authorized by N.J.S.A. 9:6-8.29 of the Dodd Act, N.J.S.A. 9:6-8.21 to -8.82.

evaluation and a psychiatric evaluation. Yvonne was provided individual and substance abuse counseling while in jail.

The Division also referred Yvonne to Dr. Alexander Iofin for a psychiatric evaluation. Dr. Iofin recommended mental health treatment, therapy, psychotropic medication, random urine screens, and supervised visitation.

At trial, Division caseworker Crystal Farkas (Farkas) testified that the Division recommended therapeutic visitation, provided supervised visitation, and referred Yvonne to individual counseling, parenting skills training, and an additional psychological evaluation. Aside from minimal compliance with the therapeutic visits, Yvonne failed to comply with any of the recommended services. Yvonne did, however, independently gain admission to a mental health and substance abuse program, but she was discharged for noncompliance and because she tested positive for illicit drugs.

Between December 2016 and May 2017, Yvonne had minimal contact with the Division. Farkas reached out to Yvonne numerous times via cell phone and by visiting her residence, but Yvonne failed to engage with the Division, which prevented her from completing recommended services. The final contact Farkas was able to make with Yvonne was a phone call in May 2017. She called Yvonne and informed her that if she "wanted to work towards getting her

children back" she would have to comply with a court order compelling her to attend services. Yvonne replied by stating, "I'm not doing services."

As to the children, Betty and Barbara have resided together in the same resource home since November 2016 while Jon was placed in his current resource home in July 2016. Though the twins' current resource family is committed to caring for them until the Division finds an adoptive family, they do not want to adopt or become kinship legal guardians.

During the course of the litigation, the Division sought temporary and long-term placement of the children with relatives and family members. For example, the Division contacted Betty and Barbara's father, Jon's father and paternal uncles to care for the children, but they were either ruled out as caretakers or failed to respond to the Division.

The Division also made efforts to assess Yvonne's aunt M.F. (Martha), who lived in North Carolina and who expressed interest in serving as a placement for Betty and Barbara. On July 6, 2016, the Division requested an Interstate Compact on the Placement of Children (ICPC) home study for Martha. Martha's ICPC home study was approved by the Division in January 2017, but the North Carolina ICPC office informed the Division that the licensing process would take at least another one to three months. Despite the delay, in April

2017, the Division began arranging visits between Martha, her husband D.F. (Dylan), and Betty and Barbara.

In August 2017, the Division received an update from the North Carolina ICPC office informing them that the licensing process would take several more months. In October 2017, the Division received a notice from the North Carolina ICPC office that Martha and Dylan's license had been processed and the approval package was expected to arrive within one to two weeks.

However, by that time the placement was in jeopardy because neither Betty nor Barbara wanted to move to North Carolina. Nonetheless, in early November 2017, the girls agreed to visit Martha and Dylan and the Division sent caseworkers to meet the family during the visit in preparation for a possible permanency plan. When the caseworkers arrived, Martha and Dylan informed them that they no longer wanted to be considered as a placement for the girls. Accordingly, the caseworkers brought Betty and Barbara back to New Jersey.

In the summer of 2017, Farkas referred the children and their resource families to Dr. David Brandwein for bonding evaluations. As to the bond between Jon and his resource family, Dr. Brandwein testified at trial that Jon's resource parents were "very empathic about what [Jon] was going through," and they "removed their wants and their needs from the situation," which the doctor

7

described as, "frankly . . . just good parenting." Dr. Brandwein further testified that Jon had finally "found some stability and permanency -- consistency and stability with [his current resource family], and that was something that . . . had eluded [Jon] from time to time in previous years because of how he moved around." Finally, Dr. Brandwein testified that he discussed parenting options aside from adoption, including kinship legal guardianship, with Jon's resource family, but they were only interested in adoption.

Dr. Brandwein conducted separate bonding evaluations and meetings with Betty and Barbara. Dr. Brandwein testified that Barbara "quite clearly" stated that she "did not wish to return to her mother's care and did not wish to go down south to live with the maternal relatives. Those are two things she did not want." Dr. Brandwein further testified that Betty described her life with Yvonne as "not that bad," but when asked about her preference for permanency, Betty said she was "really, really happy" with her current resource family and said, "[i]f I have to move, I want to be close to where I am now, not in North Carolina."

In December 2017, the court conducted a two-day trial on the Division's guardianship complaint. At trial, the Division relied on documentary evidence and the testimony of Farkas, her supervisor Deana Stickle (Stickle), and Dr. Brandwein who was qualified as an expert in forensic and clinical psychology.

None of the parents testified nor offered any evidence. Yvonne was absent from the first day of trial. On the second day, Yvonne appeared and informed the court that she was incarcerated the previous day, then she waived her appearance and left the proceedings. The Law Guardian presented no witnesses.

In a detailed oral decision, Judge Joseph L. Foster found the Division proved by clear and convincing evidence all four prongs of N.J.S.A. 30:4C-15.1(a). The judge entered a judgment terminating Yvonne's, James's and Jordan's parental rights to Betty, Barbara and Jon and awarded the Division guardianship of the children. Yvonne's appeal followed.

II.

On appeal, Yvonne argues that the judgment should be reversed because the Division did not establish the statutory criteria for termination of her parental rights with clear and convincing evidence. We disagree.

Initially, we note that the scope of our review in an appeal from an order terminating parental rights is limited. N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007) (citing In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)). "Appellate courts must defer to a trial judge's findings of fact if supported by adequate, substantial, and credible evidence in the record." Ibid. (citing In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993)).

A-1898-17T3

Moreover, due to its expertise in family matters, the Family Part's factual findings "are entitled to considerable deference." D.W. v. R.W., 212 N.J. 232, 245 (2012) (citing Cesare v. Cesare, 154 N.J. 394, 413 (1998)).

## III.

Parents have a constitutionally protected right to the care, custody and control of their children. Santosky v. Kramer, 455 U.S. 745, 753 (1982); In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). The right to have a parental relationship, however, is not absolute. N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 553 (2014); N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 599 (1986). At times, a parent's interest must yield to the State's obligation to protect children from harm. N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 397 (2009); In re Guardianship of J.C., 129 N.J. 1, 10 (1992). To effectuate these concerns, the Legislature codified the test for determining when a parent's rights must be terminated in a child's best interests. N.J.S.A. 30:4C-15.1(a) requires that the Division prove by clear and convincing evidence the following four prongs:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;

> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to

10

provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

See also A.W., 103 N.J. at 604-11.

A. Prong One

Regarding the first prong, the court concluded the Division clearly and convincingly established that Yvonne endangered and will continue to endanger the safety, health, and development of each of the three children by her "manifest indifference" and "failure to do anything meaningful at all in a way of achieving reunification . . . [which] clearly indicates . . . [a] kind of withdrawal of solicitude, nurturing, [and] care for an extended period of time . . . ." The court also found that "other than cooperation with psychiatric and psychological evaluations . . . some intermittent visitation with the three children and some short-lived cooperation . . . with treatment programs," Yvonne "has done nothing

11

at all beyond that to cooperate at all with services offered by the Division." Further, the trial court found Yvonne's inability to establish a stable home for the children endangered their health and development.

Substantial credible evidence in the record supports these findings. From 2011 to January 2016, Yvonne solely parented the children for approximately five months. Yvonne's last visit with the children was in February or March of 2017. She refused to provide her address when the Division attempted to assist her in May 2017 and said she would not comply with services. In addition, Yvonne was incarcerated again during the first day of the guardianship trial. This withdrawal of attention is cognizable harm under the first prong. See In re Guardianship of DMH, 161 N.J. 365, 379 (1999) ("A parent's withdrawal of . . . solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." (citing K.H.O., 161 N.J. at 352-54)).

B. Prong Two

As is often the case, the findings regarding the first prong inform and are relevant to the second prong. See N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 88 (App. Div. 2006). With respect to prong two, the court found that the children are entitled to permanency, and Yvonne had done

12

"nothing at all of any consequence to provide a safe and stable home" for any of the three children. The judge also found that Yvonne had "shown [a] complete unwillingness and inability to do anything of any consequence to provide any of the three children with . . . nurture[] and care . . . ."

Further, as to Jon, who is in a pre-adoptive home, the court relied on Dr. Brandwein's conclusions from the bonding evaluation "that [Jon] is securely bonded to his resource parents and that bond is more than capable of supporting [Jon] throughout the remainder of his childhood, into adolescence, and adulthood . . . ." The court also based its finding on Dr. Brandwein's testimony that if Jon were "separated from his current resource parents . . . that would result in serious and enduring emotional or psychological harm . . . ."

Regarding Betty and Barbara, whose current resource family is not interested in adoption, the court found the evidence clearly indicated that "nothing but negative consequences would follow . . . should they be reunited with their biological parents . . . ." In addition, the court found that a harmful "element of impermanency and anxiety" was present in their lives, and the "best approach" to eliminate that harm would be "to enhance their chances for select home adoption by termination."

A-1898-17T3

There was substantial credible evidence to support these findings. Yvonne's effective withdrawal from the children's lives, coupled with her recurring incarcerations, failure to participate in and complete services, and inability to provide a safe and stable home for the children clearly demonstrate her inability to eliminate the harm facing the children. Moreover, Dr. Brandwein's testimony of Jon's bond with his pre-adoptive parents is further evidence of the serious and enduring harm that will occur to Jon if Yvonne's parental rights are not terminated. The judge also found that the harm facing Betty and Barbara would only be exacerbated by a continued delay in permanent placement. This finding was supported by Stickle's uncontroverted testimony that "in order to accomplish select home adoption it's important that the children be established as legally free" because "there's a bigger pool of families who want to take children" once they are eligible for adoption.

C. Prong Three

The judge found that the Division had offered assistance to help Yvonne correct the circumstances which led to the children's removal. The Division provided Yvonne with innumerable services including therapeutic visitation, supervised visitation, individual counseling, and parenting skills training, but Yvonne failed to engage meaningfully, if at all. There is sufficient credible

14                                                                                          A-1898-17T3

evidence in the record to support the judge's finding that the Division's efforts were reasonable.

Yvonne's primary argument on appeal focuses on the second component of the third prong, i.e., whether the trial court considered alternatives to termination of parental rights. See N.J.S.A. 30:4C-15.1(a)(3). Her contention is that placing the children with her aunt and uncle, Martha and Dylan, was an alternative to terminating her parental rights which the Division failed to pursue promptly, thereby destroying the placement as a viable permanency option. Yvonne's argument overlooks the fact that throughout its involvement with the family, the Division consistently sought to place the children with relatives.

Further, pursuant to North Carolina law, "[n]o person shall . . . provide foster care for children . . . without first applying for a license to the Department [of Health and Human Services] and submitting the required information on application forms provided by the Department." N.C. Gen. Stat. §§ 131D-10.2(7), 131D-10.3(a). The simple fact is that the North Carolina agency did not process Martha and Dylan's license until October 2017, over nine months after New Jersey approved the placement, and over fifteen months after the Division requested an ICPC home study for Martha. In the meantime, the Division arranged and facilitated visitations between the girls and Martha and

Dylan. Thus, the record shows that the Division acted reasonably in attempting to place the twins with Martha and Dylan. Furthermore, there is nothing in the record which suggests Martha and Dylan would have taken a different position regarding the placement if North Carolina had processed their license earlier.

In addition, it is undisputed that even after the license was approved, Martha and Dylan withdrew from consideration as placement parents. Accordingly, the trial court correctly concluded that "there really is no alternative here to termination of parental rights."

D. Prong Four

The judge found that the Division had shown with clear and convincing evidence that termination of Yvonne's parental rights would not do more harm than good. The judge's finding is supported by sufficient credible evidence, specifically Stickle's and Dr. Brandwein's testimony.

Regarding Jon, Dr. Brandwein presented uncontroverted expert testimony that separating Jon from his resource parents would cause more harm than good because the separation would cause Jon to suffer "serious and enduring emotional and psychological harm[.]" Dr. Brandwein also testified that returning Betty and Barbara to Yvonne's care would be harmful because "the

risk for abuse or neglect that occurred at the time of the[ir] removal" remains unchanged.

Dr. Brandwein acknowledged that because Betty and Barbara's current resource family does not want to adopt or become kinship legal guardians, there will be uncertainty regarding their permanency. However, he testified that Betty and Barbara "have a very, very high chance to be adopted. They're smart, they're well spoken, for the most part they're well behaved, and they have the capability to form relationships."

Yvonne relies upon N.J. Div. of Youth and Family Servs. v. E.P., 196 N.J. 88 (2008), and argues that the Division failed to prove prong four with clear and convincing evidence because unlike Jon, Betty and Barbara are not currently with a resource family interested in adoption. Yvonne's reliance upon E.P. is misplaced because that decision is factually distinguishable.

In E.P., the Court held that the Division failed to satisfy its burden under the fourth prong by clear and convincing evidence. Id. at 111. In that case, the child was in her seventh foster home at the time of trial, the mother was the "only consistent figure in [the child's] life," and the complete severance of the parental relationship would have been "extremely painful" and "devastating" to the child. Id. at 109-10.

Here, Betty and Barbara reside with a resource family that is willing to care for them until the Division locates an adoptive family. Further, Dr. Brandwein testified that Ava, not Yvonne, was "the major parental figure" in Betty's and Barbara's lives before her death in August 2015. In addition, Dr. Brandwein stated that Barbara was adamant about not wanting to return to Yvonne's care and that both Betty and Barbara said they did not want to be with Yvonne even if the opportunity arose.

Further, in E.P., it was "highly questionable" whether the child would ever find a permanent placement family as "the expert opinions rendered at the guardianship hearings" demonstrated the window of opportunity for the child to attach to new parents was "closing real fast." Ibid. In this case, Dr. Brandwein testified to a reasonable degree of psychological certainty that based upon Betty and Barbara's ability to form relationships, it was highly likely they will be adopted.

In sum, there is sufficient credible evidence to support the trial court's determination that the Division has established all four prongs of N.J.S.A. 30:4C-15.1(a) with clear and convincing evidence. The record supports the court's finding that termination of Yvonne's parental rights is in the children's best interests.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

19