# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2271-19T2

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

J.A.,

     Defendant-Respondent,

and

P.A., SR.,

     Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF P.A., JR.,
A.P,A., A.J.A. and S.A., minors.

_____

Submitted November 16, 2020 – Decided December 21, 2020

Before Judges Gooden Brown and DeAlmeida.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Ocean County, Docket No. FG-15-0065-19.

Joseph E. Krakora, Public Defender, attorney for appellant (Sigrid S. Franzblau, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Sookie Bae, Assistant Attorney General, of counsel; Joann M. Corsetto, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors P.A., Jr. and A.P.A. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Margo Hirsch, Designated Counsel, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors A.J.A. and S.A. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Todd Wilson, Designated Counsel, on the brief).

PER CURIAM

Defendant J.A. appeals from a January 21, 2020 order of the Family Part terminating her parental rights to her four children, P.A., Jr., A.P.A., A.J.A., and S.A.[1] The children's father, defendant P.A., Sr., voluntarily surrendered his parental rights on November 13, 2019, and is not a party to this appeal. After a five-day trial, Judge Madelin F. Einbinder issued an oral opinion concluding

---

[1] We use initials to protect the anonymity of the children. R. 1:38-3(d).

that the Division of Child Protection and Permanency (DCPP or Division) had satisfied all four prongs of the test set forth in N.J.S.A. 30:4C-15.1(a), justifying termination of J.A.'s parental rights. We affirm.

I.

The following facts are derived from the record. DCPP first became involved with J.A. after P.A., Jr.'s birth on March 19, 2010, when it received a referral from the hospital reporting concerns of J.A.'s illicit drug use throughout her pregnancy. Upon investigation, the Division determined J.A. had been abusing methadone, but was actively engaged in addiction services.

On February 27, 2017, the Division received a second referral following the birth of J.A.'s fourth child, S.A., who was born prematurely with a club foot and treated for neonatal abstinence syndrome. DCPP found both parents had a history of substance abuse and the children's school reported poor attendance, but found the children were neither abused nor neglected and the parents rejected the Division's request to undergo substance abuse evaluations.

During the following months, DCPP investigated three additional referrals concerning allegations of neglect, substance abuse, and the family's deteriorating financial situation. The Division learned the family was homeless and that Ocean County Board of Social Services had placed them in a hotel, but

found no evidence to indicate neglect. However, DCPP enrolled J.A. in an intensive outpatient program after receiving a report from the methadone clinic that she tested positive for cocaine seven times in the previous few weeks.

DCPP received another referral on February 20, 2018, from P.A., Jr. and A.P.A.'s elementary school principal alleging that the children were sent to school dirty and hungry, and that their attendance was poor. DCPP caseworkers went to the family's motel and did not observe any safety concerns.

On April 17, 2018, the principal called the State child abuse hotline to report concern for the children and that nobody picked them up from school. The principal went to the family's motel and found the two younger children, A.J.A. and S.A., in the care of two adults, C.W. and M.F., whom the DCPP described as "not adequate caregivers." Background checks of C.W. and M.F. revealed a criminal history and an open case with DCPP regarding the death of their own child.

M.F. informed DCPP caseworkers that P.A., Sr. had been arrested the previous night and that J.A. had not returned home or contacted M.F. to say

when she would return. M.F. also informed the caseworkers that J.A. and P.A., Sr. seemed to be on drugs. DCPP effectuated a "Dodd removal" of the children.[2]

DCPP eventually learned that P.A., Sr. was charged with possession of cocaine and paraphernalia and was in jail. J.A. was charged with possession of a switchblade and brass knuckles.

On April 18, 2018, the Division filed a complaint for custody of the children. The trial court approved the removal and immediately placed the four children in the custody of the Division.

DCPP placed the children in a non-relative resource home. A doctor evaluated the children and expressed concerns about medical neglect because J.A. and P.A., Sr. had not obtained recommended treatment for S.A.'s club foot or possible kidney disorder.

Following the children's removal, J.A. was noncompliant with her methadone program. She completed a drug screen on April 27, 2018, and tested positive for opiates, benzodiazepines, amphetamines, and methadone after missing nine days of methadone dosing and outpatient treatment. A substance abuse evaluation was scheduled for May 3, 2018, but when the Division

---

[2] A "Dodd removal" is the emergency removal of a child from the home without a court order pursuant to N.J.S.A. 9:6-8.21 to -8.82, known as the Dodd Act. N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 26 n.11 (2011).

caseworker arrived at the motel, J.A. did not answer the door or respond to telephone calls or text messages. The evaluation was rescheduled for May 14, but again, J.A. failed to appear.

When J.A. finally completed a substance abuse evaluation on May 31, 2018, she admitted to abusing her prescribed Adderall and using fentanyl and cocaine. The Division referred J.A. to intensive outpatient treatment for opioid, methamphetamine, and cocaine use. She was noncompliant with treatment.

During the following months, J.A. continued to abuse substances and change residences frequently. The Division referred J.A. for counseling services. The counselor reported that J.A.'s most pressing issues were insecure housing, substance abuse, and unstable mental health. J.A. eventually ended counseling services because she was unwilling to keep up with scheduling.

On October 14, 2018, J.A. was arrested for shoplifting and providing false information to the police. After J.A. was released from jail, she enrolled in drug and mental health treatment on October 23, 2018. However, the program reported that she was not attending treatment sessions and tested positive for numerous drugs, including methamphetamine. J.A.'s treatment was ultimately terminated on January 2, 2019, due to her noncompliance.

On February 19, 2019, the court ordered both parents to comply with substance abuse evaluations and recommended treatment. One week later, J.A. was arrested for drug offenses after police found her sleeping in a car in a parking lot after using crystal methamphetamine. J.A. told the Division caseworker she decided to "get high after having a terrible visit with the children." J.A. was released from jail and referred for numerous substance abuse evaluations, which she failed to attend despite multiple requests by DCPP caseworkers.

A few weeks later, J.A. again tested positive for methamphetamine. J.A. reported to a Division caseworker that she used crystal methamphetamine, fell asleep in a parking lot, and woke up to paramedics trying to administer Narcan. J.A. also stated she was using crystal methamphetamine to numb herself and admitted to hearing voices when she was high. The caseworker met with J.A. and her treatment counselor to try to locate an inpatient placement. They arranged for J.A. to be admitted for detoxification and residential treatment, but she did not show up.

On April 16, 2019, J.A. failed to appear for the permanency hearing and the court approved the permanency plan of termination of J.A.'s and P.A., Sr.'s parental rights to the children followed by adoption. A.J.A. and S.A. resided in

the same resource home since their April 2018 removal. Their resource parents, T.W. and E.W., expressed an unequivocal intent to adopt both children. P.A., Jr. and A.P.A. moved from home to home due to behavioral issues, then settled in placement with their maternal uncle W.G.

DCPP terminated J.A.'s individual therapy services in September 2019 due to noncompliance. J.A. failed to attend her intake appointment, was difficult to contact, and visited the children inconsistently. DCPP referred J.A. for a psychological and bonding evaluation with David R. Brandwein, Psy.D., but she failed to attend appointments in September and November 2019.

Dr. Brandwein conducted bonding evaluations of A.J.A. and S.A. with their resource parents and found both children were securely bonded to T.W. and E.W. He recommended A.J.A. and S.A. be placed in the guardianship of the Division for the purpose of adoption by T.W. and E.W.

Dr. Brandwein also conducted bonding evaluations of P.A., Jr. and A.P.A. with their maternal uncle W.G. Dr. Brandwein found that the children were developing a bond with W.G., and that W.G. demonstrated the ability to parent and interact appropriately with the children. Based on his review of the Division record and J.A.'s ongoing failure to resolve the issues that led to the removal,

Dr. Brandwein recommended the termination of parental rights as to P.A., Jr. and A.P.A., followed by their adoption by the maternal uncle.[3]

During a five-day trial, the court heard from five witnesses on behalf of the Division. Dr. Brandwein qualified as an expert in the field of forensic and clinical psychology and testified about the bonding evaluations of the children with their respective caregivers. W.G. testified to his experience of caring for P.A., Jr. and A.P.A. during the past four months and his commitment to adopting the children. T.W. testified to his commitment to adopt A.J.A. and S.A. and his desire to maintain their sibling relationship with P.A., Jr. and A.P.A. In addition, two DCPP caseworkers provided testimony regarding the Division's involvement with the family, including the extensive services provided to J.A. and her history of noncompliance with substance abuse treatment.

J.A. testified on her own behalf and admitted abusing drugs as recently as November 2019, over a year and a half after her children were removed from her care. The law guardian did not submit evidence or present any witnesses but joined the Division in advocating for termination of J.A.'s parental rights.

---

[3] During the pendency of this appeal, the permanency plan for P.A., Jr. and A.P.A. changed. We denied J.A.'s motion for a remand and noted she could move to intervene in the then-pending guardianship matter concerning those children.

The trial court issued a comprehensive oral opinion concluding DCPP satisfied the four-prong statutory criteria by clear and convincing evidence for termination of J.A.'s parental rights. The court entered a January 21, 2020 order terminating J.A.'s parental rights to her four children.

This appeal follows. J.A. makes the following arguments for our consideration.

> THE TRIAL COURT ERRED IN FINDING THAT DCPP CARRIED ITS CLEAR AND CONVINCING BURDEN OF PROOF UNDER N.J.S.A. 30:4C-15.1(a).
>
> A. THE TRIAL COURT ERRED IN FINDING PRONG THREE WAS SATISFIED BECAUSE DCPP DID NOT MAKE A REASONABLE EFFORT TO PROVIDE SERVICES, INCLUDING COURT-ORDERED SERVICES, TO J.A.
>
> B. THE TRIAL COURT ERRED IN CONCLUDING THAT TERMINATION WOULD NOT DO MORE HARM THAN GOOD.

## II.

Our scope of review on appeal from an order terminating parental rights is limited. N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007). We will uphold a trial judge's factfindings if they are "supported by adequate, substantial, and credible evidence." N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 552 (2014). "We accord deference to factfindings of the family

court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012); see Cesare v. Cesare, 154 N.J. 394, 413 (1998). "[T]he trial court's factual findings 'should not be disturbed unless they are so wholly unsupportable as to result in a denial of justice.'" In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002) (quoting In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993)). No deference is given to the court's "interpretation of the law" which is reviewed de novo. D.W. v. R.W., 212 N.J. 232, 245-46 (2012).

When terminating parental rights, the court focuses on the "best interests of the child standard" and may grant a petition when the four prongs set forth in N.J.S.A. 30:4C-15.1(a) are established by clear and convincing evidence. In re Guardianship of K.H.O., 161 N.J. 337, 347-48 (1999). N.J.S.A. 30:4C-15.1(a) requires the Division to prove:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family

parents would cause serious and enduring emotional or psychological harm to the child;

(3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

These four prongs "are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." K.H.O., 161 N.J. at 348.

J.A. challenges only the court's determination that DCPP satisfied the third and fourth prongs of the statutory test. Specifically, she argues prong three was not met because the Division did nothing to help her secure a suitable living arrangement or treatment. In addition, J.A. argues prong four was not met because the Division failed to produce comparative bonding evaluations.

Under prong three, DCPP's efforts must be analyzed "with reference to the circumstances of the individual case[,]" including the parent's degree of participation. In re Guardianship of DMH, 161 N.J. 365, 390 (1999). N.J.S.A. 30:4C-15.1(c) defines reasonable efforts as those reasonable "attempts by an agency authorized by [DCPP] to assist the parents in remedying the

12

circumstances and conditions that led to the placement of the child and in reinforcing the family structure . . . ." The statute sets forth examples of "reasonable efforts," including but not limited to:

> (1)  consultation and cooperation with the parent in developing a plan for appropriate services;
>
> (2)  providing services that have been agreed upon, to the family, in order to further the goal of family reunification;
>
> (3)  informing the parent at appropriate intervals of the child's progress, development, and health; and
>
> (4)  facilitating appropriate visitation.
>
> [Ibid.]

After carefully reviewing the record in light of these legal principles, we conclude that substantial credible evidence supports Judge Einbinder's thorough and well-reasoned decision. There is no basis for us to disturb her determination that the Division satisfied each of the statutory prongs by clear and convincing evidence and that termination of J.A.'s parental rights was warranted.

We add only the following comments. The record demonstrates DCPP offered J.A. numerous opportunities to help secure a suitable living arrangement and address her mental health and substance abuse issues. J.A., however, never followed through with an application for housing through social services, a safe

13

house residence, or inpatient treatment. J.A. did nothing to secure a safe and secure home for her children.

In addition, the Division offered J.A. transportation, therapeutic visitation, counseling, psychological evaluations, mental health services and bonding evaluations. Most importantly, DCPP provided extensive services targeting substance abuse, which is the root of J.A.'s parenting deficit. The Division referred J.A. to numerous programs for inpatient treatment, partial care, intensive outpatient treatment and in-home therapy. J.A. either did not respond or was quickly discharged from programs for failing to attend and continuing her drug use.

It is apparent that J.A. suffers from serious mental health and substance abuse issues that likely explain her unwillingness or inability to participate in the services needed to become a reliable parent to her four children. Her failure to participate in services, even if arising from her illnesses, does not negate the reasonable efforts the Division made to reunify J.A. with her children.

We also agree with the trial court's conclusion that DCPP satisfied prong four of the statute. To satisfy the fourth prong, the court must find termination will not do more harm than good to the children. N.J.S.A. 30:4C-15.1(a)(4). This prong does not require a showing that no harm will befall the children from

14

the termination of their parent's rights. K.H.O., 161 N.J. at 355. "[T]he risk to children stemming from the deprivation of the custody of their natural parent inheres in the termination of parental rights and is based on the paramount need the children have for permanent and defined parent-child relationships." J.N.H., 172 N.J. at 478.

The trial court specifically ordered J.A. to attend the scheduled evaluations and set forth the dates. The court credited testimony from two Division caseworkers that they scheduled bonding evaluations and notified J.A. of the dates, but J.A. did not attend. In addition, Dr. Brandwein testified that J.A. failed to appear for her scheduled psychological and bonding evaluations on September 9, 2019, and the rescheduled appointment on November 6, 2019.

The Division presented the undisputed expert opinion of Dr. Brandwein, who found that A.J.A. and S.A. were bonded to their resource parents and would suffer harm if removed from their care. He was unable to assess their attachment to J.A. because she failed to attend the evaluation, which he felt was indicative of her inability to meet her own needs. As a result, Dr. Brandwein recommended A.J.A. and S.A. be freed for adoption by their resource parents, and opined termination of J.A.'s parental rights would not do more harm than good.

A-2271-19T2

Regarding P.A., Jr. and A.P.A., Dr. Brandwein testified that although the children were only in the care of their maternal uncle for a few months, W.G. appeared to be a good match and there seemed to be a "developing bond." Dr. Brandwein opined that W.G. "appears to be the only one planning for permanency for these children. He takes them in. He's committed to them through thick and thin . . . [a]nd he has the type of temperament as a parent that they need . . . ." Dr. Brandwein further testified that "the option that would do more good than harm would be for W.G. to adopt his great niece and nephew." The court found "Dr. Brandwein was unequivocal in his testimony" that P.A., Jr. and A.P.A. would not suffer more harm than good should their mother's parental rights be terminated.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2271-19T2