# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1219-18T3

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

R.R.,

     Defendant-Appellant,

and

T.C.,

     Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF T.C.,

     a Minor.

_____

       Submitted September 17, 2019 – Decided September 27, 2019

       Before Judges Yannotti and Hoffman.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FG-09-0226-18.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender, of counsel; James Daniel O'Kelly, Designated Counsel, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent (Donna Sue Arons, Assistant Attorney General, of counsel; Julie Beth Colonna, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Cory Hadley Cassar, Designated Counsel, on the brief).

PER CURIAM

R.R. appeals from an order entered by the Family Part on October 30, 2018, which terminated her parental rights to T.C., and awarded guardianship of the child to the Division of Child Protection and Permanency (Division).[1] We affirm.

I.

R.R. gave birth to T.C. in 2013. His birth father is T.C., Sr. R.R. has another child, V.F., who was born in 2002. In May 2015, the Division received

---

[1] We use initials to identify the parties and others in order to protect their identities.

A-1219-18T3

a referral indicating that R.R. was using drugs and physically abused V.F. The Division found that the report of physical abuse was unfounded, and there was insufficient evidence to show substance abuse, but opened the case for services.

The Division arranged for R.R. to attend a drug counseling assessment, where she submitted to a drug screening. The sample she provided tested positive for cocaine. The Division referred R.R. for a substance abuse evaluation and substance abuse treatment. R.R. successfully completed the program at Project Second Chance in January 2016.

In May 2016, R.R. had a random drug screen and tested positive for cocaine and marijuana. The Division referred R.R. for another substance abuse evaluation, and established a Safety Protection Plan, which provided, among other things, that the maternal grandmother would supervise R.R.'s contact with the children, and R.R. would attend a substance abuse treatment program at Freedom of Choice.

In June 2016, the Division filed a complaint in the trial court seeking care and supervision of T.C. and V.F. R.R. then began treatment at Freedom of Choice. R.R. completed an initial drug screening, and her sample tested positive for alcohol and marijuana. The results indicated that R.R.'s sample was diluted.

A-1219-18T3

On July 14, 2016, the court granted the Division's application for custody of T.C. and V.F. and placed the children in the Division's immediate care and supervision. The court ordered that any interaction R.R. had with the children must be supervised by R.R.'s mother until R.R. tested negative at four, consecutive drug screenings and she completed a substance abuse program.

In September 2016, a substance abuse counselor reported that R.R. missed several appointments at the Freedom of Choice program and that the program had dismissed her from treatment. The counselor reported he was unable to make contact with R.R. He recommended that R.R. receive a higher level of care, including inpatient hospitalization.

In September 2016, R.R. met with the counselor for another substance abuse evaluation. During the meeting, R.R. admitted she diluted urine samples she provided during earlier drug screenings. She also acknowledged that her behavior and failure to attend treatment interfered with her goal of "getting [the Division] out of [her] life."

The counselor and R.R. developed a plan for treatment. R.R. agreed to attend another outpatient program at Project Second Chance because that program "is closer" and because she "has had some success at this provider previously."

 A-1219-18T3

In October 2016, R.R. began treatment with Project Second Chance. In November 2016, a Division caseworker visited R.R.'s apartment and discovered R.R. alone with V.F., in violation of the court's July 14, 2016 order. In December 2016, Project Second Chance dismissed R.R. from its program because of her failure to attend. The program's records reveal that R.R. last attended treatment on November 25, 2016.

In December 2016, the Division filed an amended order to show cause and verified complaint in the trial court, seeking custody of T.C. and V.F. In January 2017, R.R. appeared in court and the judge ordered R.R. to submit to an "instant drug test." She tested positive for cocaine. The judge granted the Division's application for custody of T.C. and V.F.

The judge ordered that T.C. shall be placed in the Division's care, and V.F. placed with R.R.'s mother. The Division thereafter placed T.C. with M.D., a non-relative foster mother, and her family. R.R. met with a Division caseworker and agreed to seek treatment and submit to a psychological evaluation.

In February 2017, R.R. and a Division caseworker appeared in court for a review hearing. The caseworker spoke with R.R. outside the courtroom and informed her that the Division was prepared to place T.C. with R.R.'s maternal aunt L.R. and her husband. R.R. introduced the caseworker to her brother's wife,

V.R., who told the caseworker that she and her husband T.R. were willing to care for T.C. and V.F. at some time in the future.

In February 2017, the Division removed T.C. from his non-relative resource family and placed him in the care of L.R. and her husband, who live in the same apartment as R.R. and R.R.'s mother. At this time, V.F. was living with R.R.'s mother in a separate apartment in the same building. During a visit with a caseworker on March 21, 2017, L.R. informed the caseworker that she and her husband could not care for T.C. on a long-term basis, and recommended V.R. and T.R. as potential long-term caretakers for T.C.

On March 23, 2017, the Division arranged for R.R. to attend an outpatient substance abuse treatment program at Integrity House, which was scheduled to begin in April 2017. R.R. began treatment as scheduled. Records dated May 18, 2017, indicate that at that time, the Division was considering placing T.C. with V.R. and T.R.

On June 7, 2017, Integrity House dismissed R.R. from its program after she failed to attend several treatment sessions. The following month, however, Integrity House readmitted R.R. to its program. R.R. attended treatment for approximately one week, but then failed to return for further sessions.

A-1219-18T3

In July 2017, the Division placed T.C. in V.R. and T.R.'s home, where he resides today. The record reveals that, sometime earlier, R.R.'s mother, who was caring for V.F., moved into the other apartment in V.R. and T.R.'s two-family home. The Division found that T.C. appeared happy in his new home and especially enjoyed living in the same building as his older brother, V.F.

After T.C.'s placement, V.R. and T.R. spoke with R.R. and agreed that she would visit T.C. on Mondays, Wednesdays, and Fridays from 6:00 p.m. until 8:00 p.m. On August 2, 2017, R.R. sent a text message to V.R. at 6:00 p.m. and stated she would be unable to visit that day. On August 4, 2017, R.R. visited T.C. for one hour. The caseworker who supervised the visit reported the visit "went well" and "there were no concerns."

The record shows R.R. cancelled her visits with T.C., which were scheduled for August 7, 11, 14, and 16, 2017. From August 14 to August 25, 2017, the Division attempted to contact R.R. by phone to schedule a family meeting, but could not reach her. On September 19, 2017, the Division attempted to contact R.R. by knocking on the door of her apartment, but no one came to the door and R.R. did not answer or return the Division's telephone call.

The Division eventually made contact with R.R. on September 22, 2017, and arranged for R.R. to attend a drug counseling assessment. On October 13,

2017, R.R. visited T.C. at V.R.'s home from 6:30 to 8:00 p.m. The caseworker reported R.R. was using her cell phone most of the time and that she was "not attentive to the child's needs." R.R. visited T.C. for approximately twenty-two minutes on October 16, approximately thirty minutes on October 18, and approximately fifteen minutes on October 20, 2017.

On December 5, 2017, the trial court entered an order continuing T.C. in the Division's care, custody, and supervision. The court also approved the Division's permanency plan to terminate R.R.'s parental rights to T.C. The court found it was unsafe to return T.C. to R.R.'s care because R.R. failed to take steps to remedy her drug abuse and failed to maintain contact with the Division.

On December 12, 2017, a Division caseworker visited V.R.'s home to check on T.C. V.R. informed the caseworker that R.R. had not visited T.C. since December 1, and that since that time, R.R. had been evicted from her apartment because she failed to pay rent. V.R. did not know where R.R. was living.

On December 20, 2017, a Division caseworker visited V.R.'s home to check on T.C. The caseworker reported T.C. was doing well and reported no concerns about the child's well-being. V.R. told the caseworker that R.R. still had not visited T.C. R.R. also missed the visit scheduled for December 29, 2017, and never called V.R. to tell her she would not be making the visit.

On January 9, 2018, the Division filed a complaint for guardianship seeking to terminate R.R.'s parental rights to T.C. During a court conference on January 31, 2018, the judge ordered R.R. to attend further substance abuse evaluations and treatment; participate in a psychological evaluation; and have a hair follicle drug screening. The judge suspended R.R.'s privileges to visit T.C.

On March 28, 2018, R.R. attended a substance abuse evaluation and submitted to a urine screening, which was negative for illegal substance use. Even so, the evaluator recommended that R.R. attend a level-one outpatient treatment program based on her history of substance abuse. Around this time, the court reinstated R.R.'s supervised visitation, which began in July 2018. R.R. missed visits with T.C. scheduled for July 26, August 2, 4, 16, and 23, and September 6, 2018.

The guardianship trial took place in October 2018. At the beginning of the trial, T.C.'s father, T.C., Sr. voluntarily surrendered his parental rights to T.C. to the Division, agreeing to the child's adoption by his foster parents. The Division proceeded with its complaint seeking termination of R.R.'s parental rights. She did not attend the trial, but was represented by counsel. The Division presented testimony from Dr. Robert Kanen, V.R., and Division caseworker

Edelly Polanco. T.C.'s Law Guardian offered testimony from Dr. Elizabeth Smith, and R.R. presented testimony from Dr. Andrew Brown, III.

On October 30, 2018, Judge Bernadette N. DeCastro filed a written opinion in which she concluded that the Division had established by clear and convincing evidence the four factors of the best-interests-of-the-child standard, codified in N.J.S.A. 30:4C-15.1(a). The judge found that it was in T.C.'s best interests to terminate R.R.'s parental rights, and awarded the Division guardianship of the child for all purposes, including adoption. The judge memorialized her decision in an order entered on October 30, 2018. This appeal followed.

II.

On appeal, R.R. argues: (1) the Division did not present evidence establishing that her use of illicit substances harmed or threatened T.C.'s health and safety; (2) the Division failed to arrange services that would have assisted her to overcome her substance abuse; and (3) the record establishes that termination of her parental rights will do more harm than good. R.R. does not

argue that the court erred by finding the Division established the second prong of the best interests standard.[2]

Initially, we note that the scope of our review in an appeal from an order terminating parental rights is limited. N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007) (citing In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)). "Appellate courts must defer to a trial judge's findings of fact if supported by adequate, substantial, and credible evidence in the record." Ibid. (citing In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993)).

The Division may initiate a petition to terminate parental rights in the "best interests of the child" and the court may grant the petition if the Division establishes the criteria codified in N.J.S.A. 30:4C-15.1(a) with clear and convincing evidence. N.J. Div. of Youth & Family Servs. v. I.S., 202 N.J. 145, 166-68 (2010). "The four criteria enumerated in the best interests standard are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." Id. at 166 (quoting N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 506–07 (2004)).

---

[2] Because R.R. has raised no issue as to prong two in her brief, any claim regarding that prong is deemed waived. See El-Sioufi v. St. Peter's Univ. Hosp., 382 N.J. Super. 145, 155 n.2 (App. Div. 2005).

A. <u>Prong One</u>

Prong one requires the Division to prove that "[t]he child's safety, health or development has been or will continue to be endangered by the parental relationship[.]" N.J.S.A. 30:4C-15.1(a)(1). This prong focuses on the negative effect the parent-child relationship has upon the child's safety, health, and development. <u>In re Guardianship of K.H.O.</u>, 161 N.J. 337, 348 (1999). To satisfy prong one, the Division is not required to show that the child was physically harmed, and evidence that the child suffered psychological harm is sufficient. <u>Matter of Guardianship of K.L.F.</u>, 129 N.J. 32, 43-44 (1992).

Here, Judge DeCastro found that T.C. was harmed because the child remained in foster care and was denied permanency for about two years. In reaching this conclusion, the judge pointed out that R.R. failed to complete the tasks necessary for reunification. The judge noted that R.R. never completed substance abuse treatment, failed to remain substance free, did not maintain employment, failed to maintain contact with T.C., and did not provide the child with a safe and stable home.

On appeal, R.R. argues that the judge's findings on prong one are not supported by the record because there is no evidence showing that T.C. suffered or was exposed to harm. She asserts that T.C. was well cared for, and her

12

apartment was neat, clean, and properly furnished. She contends there were no safety concerns in the apartment, and the Division's caseworkers indicated that she did not appear to be under the influence of illicit substances when they visited.

We are convinced, however, that there is sufficient credible evidence in the record to support the trial court's finding that the Division established prong one with clear and convincing evidence. The record shows that the Division provided R.R. with services for her substance abuse problems since May 2015. After receiving services for several months, including outpatient treatment at Project Second Chance, R.R. failed drug screenings in both May and June 2016.

R.R. also did not complete a substance abuse treatment program and failed to provide four consecutive negative drug screens between the court's July 2016 order and the trial in October 2018. In that time, T.C. had been removed from his mother's home, placed in the home of a non-relative foster mother, removed and placed in the care of his great-aunt and great-uncle, and then removed again and placed with his maternal uncle and aunt, where he remains today.

Our Supreme Court has observed "the attention and concern of a caring family is 'the most precious of all resources.'" In re Guardianship of DMH, 161 N.J. 365, 379 (1999) (quoting N.J. Div. of Youth & Family Servs. v. A.W., 103

N.J. 591, 613 (1986)).  Furthermore, "[a] parent's withdrawal of . . . solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child."  Ibid. (citing K.H.O., 161 N.J. at 352-54).  Here, the child was harmed by R.R.'s failure to provide him with solicitude, nurture, and care over an extended period of time.

Moreover, the record supports the court's finding that T.C. was harmed by R.R.'s failure to maintain consistent visitation.  The record shows that after the Division placed T.C. in V.R. and T.R.'s custody in July 2017, R.R. was scheduled to visit the child for several hours on three nights per week.  From August to October 2017, R.R. cancelled numerous visits and when she did visit, she stayed only briefly.

In January 2018, the court suspended R.R.'s visitation but restored visitation, which continued in July 2018.  The Division scheduled fifteen visits from July to September 2018, but R.R. attended visits five times.  The caseworker stated that when R.R. failed to appear for a meeting, T.C. became "very upset" and "really uncontrollable."  At trial, Dr. Kanen testified that T.C. has "already experienced significant emotional distress because the biological parents have been inconsistent, unpredictable, and unreliable."

We conclude there is sufficient credible evidence in the record to support the trial court's finding that the Division established prong one of the best interests standard with clear and convincing evidence.

B. Prong Three

Prong three of the best interests standard requires the Division to establish that it "made reasonable efforts . . . to help the parent correct the circumstances which led to the child's placement outside the home" and considered alternatives to termination of parental rights. N.J.S.A. 30:4C-15.1(a)(3). Prong three "contemplates efforts that focus on reunification of the parent with the child." K.H.O., 161 N.J. at 354. Moreover, the reasonableness of the Division's efforts is not measured by whether its efforts were successful in bringing about reunification of the parent and child. DMH, 161 N.J. at 393.

In her opinion, Judge DeCastro found that the Division made reasonable efforts to address the circumstances that led to T.C.'s placement outside the family home. The judge noted that the Division provided R.R. with psychological and bonding evaluations, substance abuse programs, and visitation. The judge also found that the Division had considered alternatives to termination of parental rights and determined that there were no such alternatives.

15

On appeal, R.R. argues that there is insufficient evidence in the record to support the judge's findings on prong three. R.R. notes that after she relapsed in January 2016, she began an outpatient substance abuse treatment program but was discharged from the program after she provided diluted urine samples. R.R. contends that the Division's counselor recommended a higher level of care and inpatient hospital treatment, but the Division recommended her for outpatient services.

The record does not support R.R.'s argument. In his evaluation report, dated September 6, 2016, the substance abuse counselor at Freedom of Choice noted that R.R. had not complied with treatment. The counselor recommended a higher level of care, which would include "inpatient hospitalization."

Thereafter, the Division arranged for R.R. to have updated substance-abuse evaluation. R.R. attended the evaluation with the counselor, who reported that R.R. agreed to cease diluting the urine samples and attend an outpatient program at Project Second Chance, because it was close to her home and she previously had success with that provider. R.R. was later discharged from that program for lack of compliance.

The evidence also supports Judge DeCastro's decision to allow V.R. and T.R. to adopt T.C., instead of establishing a kinship legal guardianship. At trial,

Dr. Kanen testified that T.C. has benefitted from being placed with "a biological relative that [is] committed to adopt him and committed to providing him with a permanent, safe, and secure home."

Dr. Kanen stated that "it's critical the child have a permanent home" and that "without permanency the child will live in a state of uncertainty[.]" Dr. Kanen added that, right now, T.C. "to a certain extent lives in a state of uncertainty when the parents don't show up and disappoint him."

We conclude that the record supports the trial court's finding that the Division made reasonable efforts to address the circumstances that led to T.C.'s removal from her care and his placement in foster care, and the Division properly considered alternatives to termination of R.R.'s parental rights.

C. Prong Four

To establish prong four, the Division must present clear and convincing evidence showing that "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). "[T]he fourth prong of the best interests standard cannot require a showing that no harm will befall the child as a result of the severing of biological ties." K.H.O., 161 N.J. at 355.

Instead, the court must balance the relationships of the biological parent and the child, "and determine whether the child will suffer greater harm from

terminating the child's ties with" his or her biological parent than from permanent disruption of the child's relationship with a resource parent. <u>N.J. Div. of Youth & Family Servs. v. A.G.</u>, 344 N.J. Super. 418, 435 (App. Div. 2001) (citing <u>K.H.O.</u>, 161 N.J. at 355).

Here, Judge DeCastro found that Dr. Kanen and Dr. Smith had persuasively testified that T.C.'s foster parents would be able to mitigate any harm T.C. might suffer if R.R.'s parental rights were terminated. The judge found that "if [R.R.] continues to be inconsistent and unavailable for her son, the harm will be more devastating than termination of her parental rights due to her continued unavailability to provide consistent love and nurture to him."

On appeal, R.R. argues that the Division failed to establish that the termination of her parental rights will not do more harm than good. She contends the Division failed to arrange appropriate services for her, which contributed to Dr. Kanen's opinion that termination of parental rights will not do more harm than good. She asserted that T.C. enjoys a "deep" relationship with her, and while T.C. has a positive and healthy bond with his resource parents, that bond should not supersede his emotional attachment to his birth mother. She contends that terminating her parental rights before she is provided

with services that could effectively address her substance-abuse problems, would do more harm than good.

We are convinced, however, that there is sufficient credible evidence in the record to support the trial court's finding that the Division established with clear and convincing evidence that termination of R.R.'s parental rights will not do more harm than good. As noted previously, the record supports that trial court's finding that the Division provided R.R. with appropriate services to address her substance abuse.

Furthermore, at trial, Dr. Kanen testified that T.C. has "already suffered significant emotional distress" because R.R. has been "inconsistent, unpredictable, and unreliable." He found that the Division's records do not indicate R.R. "wants to or is capable of providing [T.C.] with a permanent, safe, and secure home." He stated that if T.C. is removed from his foster parents' care and returned to R.R.'s care, he will suffer substantial distress, which R.R. is incapable of mitigating.

Dr. Kanen further testified that terminating R.R.'s parental rights to T.C. would not cause T.C. substantial harm. He found that T.C. is now with "a biological relative that [is] committed to adopt him and committed to providing him with a permanent, safe and secure home." Dr. Smith testified that V.R. and

T.R. would "[a]bsolutely" be able to mitigate any harm from that termination. Thus, the record supports the judge's finding that terminating R.R.'s parental rights to T.C. would not do more harm than good.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION