# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS.   A-0989-23
                       A-0990-23

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

      Plaintiff-Respondent,

v.

J.M. and T.T.P.,

      Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF H.P. and R.P.,
minors.

_____

      Submitted January 14, 2025 – Decided February 6, 2025

      Before Judges Gilson, Bishop-Thompson, and Augostini.

      On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Salem County, Docket No. FG-17-0012-23.

Jennifer N. Sellitti, Public Defender, attorney for appellant J.M. (James D. O'Kelly, Designated Counsel, on the briefs).

Jennifer N. Sellitti, Public Defender, attorney for appellant T.T.P. (Louis W. Skinner, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Donna Arons, Assistant Attorney General, of counsel; Julie B. Colonna, Deputy Attorney General, on the brief).

Jennifer N. Sellitti, Public Defender, Law Guardian, attorney for minors (Meredith Alexis Pollock, Deputy Public Defender, of counsel; David B. Valentin, Assistant Deputy Public Defender, of counsel and on the briefs).

PER CURIAM

In these consolidated appeals, J.M. (Jennifer) and T.T.P. (Thomas) (collectively, defendants) appeal from a judgment terminating their parental rights to their children, R.P. (Robert) and H.P. (Heather), and granting guardianship of the children to the Division of Child Protection and Permanency (the Division).[1]  Defendants argue that the Division failed to prove the four prongs of the "best interests of the child" standard necessary for the termination

---

[1]  We use initials and fictitious names to protect privacy interests of the parties and the confidentiality of the record.  See R. 1:38-3(d)(12).

A-0989-23

of their parental rights, particularly regarding prongs three and four. See N.J.S.A. 30:4C-15.1(a). Defendants also contend that post-termination changes in Robert's placement constitute changed circumstances requiring a remand for reconsideration of the termination decision or other relief under Rule 4:50-1. The Division and the children's Law Guardian urge that we affirm the judgment. Having reviewed the record in light of the parties' contentions and the applicable law, we affirm substantially for the reasons explained by Judge Mary K. White in her oral decision placed on the record on November 13, 2023, and the written amplification appended to the amended judgment dated December 3, 2023.

## I.

The facts and evidence are detailed in Judge White's opinion and amplification, which she rendered after a five-day trial. Accordingly, we summarize some of the more relevant facts. Jennifer and Thomas are the biological parents of Robert, who was born in July 2021, and Heather, who was born in March 2023. Jennifer also has a daughter, A.L. (Amanda), who was born in March 2013, and is currently in a kinship legal guardianship (KLG) arrangement with Jennifer's mother, M.M. (Maddie). Amanda is not involved in this appeal. Thomas has four other children, who are in the custody of their mothers, and those children are also not involved in this appeal.

Thomas and Jennifer's relationship has a history of domestic violence and instability. The Division first became involved with the family in 2013, when it received reports of abuse and neglect regarding Amanda, which were ultimately not substantiated. Several years later, in June 2021, the Division once again became involved when Jennifer reported to the police that Thomas had used corporal punishment on Amanda and had assaulted her. Robert was born approximately one month later.

Due to Thomas' history of domestic violence, the Division implemented a safety protection plan requiring that Jennifer and Thomas be supervised when co-parenting Robert and Amanda. The Division also offered the family preservation services and asked both parents to complete psychological evaluations. Following their evaluations, Jennifer and Thomas were referred for individual therapy, co-parenting mediation, psychiatric evaluations, domestic violence education, parenting skills training, and drug screens. Because of violations of the safety protection plan and further episodes of domestic violence, however, the Division removed Amanda and Robert from their care. After Heather was born, she was also removed from her parents' care and placed with a confidential family member, where she has remained.

4

Unfortunately, Robert has had several placements since being removed from defendants' care. Prior to trial, Robert had five placements, including one with his maternal aunt, F.L. (Francesca). Thereafter, the Division informed us that Robert was re-placed with Francesca in November 2023; however, one month later she requested his removal, which led to his placement in a new pre-adoptive resource home in March 2024. Most recently, the Division informed us that Robert was "successfully" placed into another pre-adoptive resource home in December 2024.

The guardianship trial was conducted over five, nonconsecutive days in October 2023. Judge White heard testimony from three witnesses: Dr. James Loving, an expert called by the Division; Martina Lewis, the Division's adoption worker assigned to the case; and Francesca, Jennifer's sister.

Dr. Loving testified about the psychological and bonding evaluations he conducted of Thomas, Jennifer, Robert, and Robert's then-resource parents. Dr. Loving conducted two sets of evaluations: evaluations that occurred in December 2022 and January 2023; and updated evaluations that occurred in August 2023. At the time he conducted both sets of evaluations, Dr. Loving understood that the Division's permanency goal for Robert was adoption.

A-0989-23

Concerning Thomas, Dr. Loving testified about his history of substance abuse, prior history with the criminal justice system, and "really extensive and severe history of domestic violence . . . especially with [Jennifer]." He also testified concerning interactions with Division staff, where Thomas was reportedly "hostile and threatening, and he repeatedly downplayed or denied [those actions]." Dr. Loving diagnosed Thomas with "Intermittent Explosive Disorder," which he described as "a pattern of poorly controlled, explosive, angry, [and] sometimes aggressive behavior," and "Antisocial Personality Disorder[] with narcissistic traits," which he described as "a personality style . . . that involves basically disregarding other people and their rights and their safety." Based on his evaluations, Dr. Loving opined that "there is a high risk of emotional and physical harm if [Robert] were to be reunified with [Thomas]." More specifically, Dr. Loving opined that:

> [T]here is an extremely high risk for domestic violence here that [Robert] would be exposed to if he was under [Thomas'] care or his custody. That would place [Robert] at risk of being physically hurt and it would also place him at risk of having emotional problems related to being exposed to domestic violence.

As to Jennifer, Dr. Loving noted "important differences between what she said to [him] versus what [had] been reported collaterally." Specifically, when Dr. Loving asked her about the domestic violence, she said that "there had been

6

one incident [during] their relationship when [Thomas] had pushed her, and that was the only physical altercation or physical abuse throughout their relationship."  Following the testing portion of the evaluation, Dr. Loving diagnosed Jennifer with "Major Depressive Disorder and Dependent Personality Traits."  Dr. Loving ultimately opined that "[t]here's an extremely high risk for domestic violence here and that's true if [Robert] were to be under [Jennifer's] custody or care."  More specifically, Dr. Loving stated that:

> The most likely scenario here is that [Jennifer] and [Thomas] remain in a relationship or at least remain involved with each other in some capacity.  And as long as they do, there is going to be an extremely high risk for domestic violence.  And [Robert] would be at risk for physical harm and also at risk for emotional harm if he were under her care [or] custody, for the same reasons I talked about earlier.

Following his updated evaluations of defendants, Dr. Loving's original impressions remained largely the same.  Moreover, Dr. Loving stated that his concerns had increased due to a new incident of domestic violence following a parenting class.

With regards to the bonding evaluations, Dr. Loving described Robert as being "passively receptive" to Jennifer, meaning that "[h]e was tolerating her interactions but he was also doing nothing to engage with her."  In contrast, Dr. Loving found that Robert "was more expressive and interactive with his father."

A-0989-23

Following the first bonding evaluation, Dr. Loving described Robert "as having a weak attachment with [Jennifer] [and] a weak to moderate attachment with [Thomas]." Following the second bonding evaluation, Dr. Loving described Robert as having "a moderate/moderately strong attachment to [Thomas] . . . a bit stronger than what [he] described before." Nonetheless, Dr. Loving concluded that "[Robert] is at low risk of long-term emotional harm if his relationships with his mother or his father were to be cut off." He noted that Robert was "showing signs of [the] situation taking an emotional toll on him," and recommended that Robert be placed with a permanent caregiver or family as soon as possible.

Martina Lewis testified about the Division's involvement with the family, including efforts and steps the Division had made to assist defendants. She testified that after the Division began providing services, incidents of domestic violence continued to occur between Jennifer and Thomas. Additionally, she explained that Jennifer did not maintain consistent visitation with the children following their removal. Thomas, in contrast, consistently visited both children, but had repeated confrontations with Division workers, including threatening workers and announcing that he no longer wanted to visit his children.

A-0989-23

Lewis also detailed the Division's efforts to place the children with other family members. She testified that the Division assessed Maddie, Jennifer's mother, "more than once." Maddie initially expressed interest in a KLG arrangement with Robert, but "[a]fter moving into [a] bigger apartment, it was deemed that she could not have [Robert] because [her] landlord would not add anyone onto the lease." Thus, Maddie effectively "ruled herself out."

Lewis also discussed Francesca, Jennifer's sister, with whom Robert had been placed with for "roughly . . . two months." Francesca had initially asked for Robert's removal following an incident where Thomas "had come to her home cursing, screaming, demanding to see [Robert], and where the police had to be called." Notwithstanding, Lewis noted that if Francesca were to approach the Division for custody of Robert, they would reassess her.

Based on that testimony, as well as other evidence submitted at trial, Judge White made extensive findings of facts and conclusions of law. The judge found that both the Division's witnesses were credible, but in varying degrees. Judge White found Dr. Loving to be a "highly credible" witness. She also found that "Lewis [was] a credible witness," but had concerns regarding Lewis' view of Francesca. The judge did not make any express findings concerning Francesca's credibility.

In her amplification, Judge White detailed her review of the documents admitted into evidence. Based on that unrebutted evidence, Judge White found that both Jennifer and Thomas had a history of experiencing housing instability. She also found there was credible evidence that Thomas had committed acts of domestic violence against Jennifer. Moreover, the judge found that Thomas had difficulty controlling his anger and that his outbursts had impeded the Division's efforts to reunite Thomas with his children. Judge White also noted reports that Jennifer had twice been hospitalized for psychiatric care and that she had not established stability.

Judge White then found that the Division had proven each of the four prongs of the children's best-interests standard by clear and convincing evidence. Addressing prong one, Judge White found that the parental relationship had and would continue to endanger the children's safety, health, and development. In her amplification, she detailed the instability of both Jennifer and Thomas, including repeated incidents of domestic violence. The judge found that despite the Division's attempts to implement "every format of safety plan; in-house . . . skilled social workers, who were providing coaching, supervised visits and coaching on life and just stabilizing financial and other matters," the safety protection plans continued to be violated, and the domestic violence continued

A-0989-23

to occur. The judge also found that this instability and ongoing domestic violence placed the children at risk.

Turning to the second prong, Judge White found that the parents were unwilling or unable to eliminate the harm facing their children. The judge specifically found that, although the parents were aware of the volatile nature of their relationship, they wanted to continue to "parent together, even though their relationship was one of a constant risk of violence to [Jennifer] and to any children in their care, just from crossfire injury or observing all that instability." The judge also noted that Jennifer had shown little interest in visiting her children and had missed most of the visits arranged by the Division.

Addressing prong three, Judge White first found that the Division had made reasonable efforts to provide services to the parents. Those services included parenting classes, domestic violence avoidance training, evaluations, and therapy. Despite those various services, both Jennifer and Thomas continued to engage in activities that put their children at risk of substantial harm. Indeed, the judge found that Thomas' ongoing inability to control his anger undercut the beneficial impact of many of the services provided to him.

Second, the judge found that the Division had made "reasonable efforts to be attuned to the family" and to try to place the children with family members.

11

In her amplification, the judge found that Robert had been moved from two family placements because of Thomas' disruptive behavior and that other non-family placements had also been negatively impacted. Thus, Judge White found that Thomas' improper behavior was "the cause or a major contributing cause to" Robert's placements being changed four times. The judge further noted that "[n]one of the relatives that were . . . interviewed to take care of [Robert] . . . wanted to live with the risk of [Thomas'] behavior."

Lastly, addressing prong four, Judge White found that the termination of defendants' parental rights would not do the children more harm than good. In reaching that conclusion, the judge relied on the unrebutted testimony of Dr. Loving. Judge White acknowledged that "Robert [had] been moved now four times and that [those movements] place[d] him at some risk," but found the changes in his placement were "not because of a condition of the child . . . [but] because people [were] afraid of [Thomas]." The judge also recognized that she was reaching this determination even though Robert's permanency plan was unsettled.

On November 13, 2023, Judge White entered a judgment awarding guardianship of Robert and Heather to the Division. She later amended the judgment on December 3, 2023, to include an amplification of her decision. In

her amplification, Judge White stated that her judgment was "not intended to be an obstacle to the Division consenting, as in the best interest of [Robert], to either adoption of [Robert] by family member [Francesca] . . . or to entry [of] [KLG] . . . with [f]amily member [Francesca]."

## II.

On appeal, Jennifer and Thomas contend that the Division failed to prove the four prongs of the best interests of the child standard necessary for the termination of their parental rights. See N.J.S.A. 30:4C-15.1(a). Particularly, they argue that the trial court erred in failing to assess KLG with Maddie or Francesca as an alternative to termination of their parental rights. In addition, they assert that post-trial events concerning Robert's placement constitute changed circumstances requiring reconsideration of the decision to terminate their parental rights or entitling them to other relief under Rule 4:50-1.

1.   The Record Does Not Support Defendants' Arguments.

A review of the evidence presented at trial establishes that all of Judge White's findings concerning the four prongs are supported by substantial and credible evidence. N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012). Moreover, Judge White correctly summarized the law and correctly applied her factual findings to the law. See N.J. Div. of Child Prot. &

Permanency v. P.O., 456 N.J. Super. 399, 407 (App. Div. 2018). In that regard, our Supreme Court has recognized: "In a termination of parental rights trial, the evidence often takes the form of expert opinion testimony by psychiatrists, psychologists, and other mental health professionals." N.J. Div. of Child Prot. & Permanency v. R.L.M., 236 N.J. 123, 146 (2018). Judge White properly relied, in part, on the unrebutted testimony of Dr. Loving, who conducted several evaluations and had factual bases for his opinions.

Regarding prongs one and two, Thomas argues that "[he] never inflicted actual harm upon Robert or Heather, nor placed them in a risk of harm." Our Supreme Court, however, has made clear that the harm need not be physical, as "[s]erious and lasting emotional or psychological harm to children as the result of the action or inaction of their biological parents can constitute injury sufficient to authorize the termination of parental rights." In re Guardianship of K.L.F., 129 N.J. 32, 44 (1992).

At trial, Dr. Loving credibly opined that the ongoing domestic violence between Thomas and Jennifer posed "a high risk of emotional and physical harm" if the children were to be reunited with either Jennifer or Thomas. Further, Lewis testified that such violence continued to occur after the Division began providing services to the family. Unfortunately, both Jennifer and Thomas demonstrated

14

an unwillingness or inability to eliminate the high risk of harm by continuing to express their desire to parent together. Moreover, Jennifer never demonstrated the ability to provide appropriate housing and stability for the children. Concerning Thomas, Judge White found that he had ongoing anger management issues that would prevent him from being a stable parent. The judge also noted Thomas' inability to find stable housing and circumstances that would support the children.

Both Jennifer and Thomas focus most of their arguments on prong three, contending that the Division failed to make reasonable efforts to provide services or consider alternatives to the termination of their parental rights. As an initial matter, Judge White found, and the record shows, that the Division provided various services, including "every format of [a] safety plan," in-house visits from social workers, supervised visits with the children, life coaching, and various forms of other support, including financial assistance, all designed to stabilize the family.

Thomas and Jennifer further argue that Judge White overlooked recent amendments to the law concerning KLG and failed to consider KLG arrangements with Maddie or Francesca as an alternative to the termination of their parental rights. Effective July 2021, various sections of statutes concerning

child protective services were amended. See L. 2021, c. 154. The Legislature declared "[k]inship care is the preferred resource for children who must be removed from their birth parents because use of kinship care maintains children's connections with their families." L. 2021, c. 154, § 1. Consistent with that intent, the Legislature made several amendments (the 2021 amendments) to the Kinship Legal Guardianship Act, N.J.S.A. 3B:12A-1 to -7, including elimination of the requirement that adoption of the child be "neither feasible nor likely" before a court may appoint a guardian. L. 2021, c. 154, § 4; N.J.S.A. 3B:12A-6(d)(3). Accordingly, Jennifer and Thomas argue that Judge White erred by failing "to consider KLG as an obvious available alternative to [the] termination of [their] parental rights in violation of the law."

In amending the Kinship Legal Guardianship Act, the Legislature was not foreclosing adoption. Instead, it was emphasizing the need for consideration of kinship caregiving. See N.J. Div. of Child Prot. & Permanency v. D.C.A., 474 N.J. Super. 11, 27, 29 (App. Div. 2022), aff'd, 256 N.J. 4 (2023) (acknowledging that the 2021 amendments were "intended to reflect a preference for viable kinship guardians and fit parents over unrelated foster caretakers," but affirming the trial court's determination to terminate parental rights where "no alternative familial guardian was feasible").

16                                                    A-0989-23

Here, both the Division and Judge White considered KLG with Maddie and Francesca as alternatives to the termination of defendants' parental rights. As Judge White properly found, however, "[n]one of the relatives that were . . . interviewed to take care of [Robert] . . . wanted to live with the risk of [Thomas'] behavior."

Regarding Maddie, Lewis testified that the Division had explored Maddie "more than once" as a placement option for the children. It was determined, however, that Maddie could not have Robert because her landlord would not allow her to have another person in her apartment. Additionally, when speaking to the Division about a potential KLG arrangement, Maddie repeatedly expressed concerns about interacting with Thomas for eighteen years and explained that he was restricted from her home because of a no-contact order protecting Amanda.

As to Francesca, Thomas alleges that "[d]espite her willingness and ability to care for Robert, she was improperly and unjustly dismissed [from consideration]." The record rebuts that contention. In her amplification, Judge White stated that her judgment was not intended to be an obstacle to the Division consenting to either the adoption of Robert by Francesa or to the entry of KLG with Francesca. As such, following the guardianship trial, the Division re-placed Robert with Francesca. Unfortunately, approximately one month later, in

17

December 2023, Francesca again asked that Robert be removed. Accordingly, we reject defendants' arguments as to prong three.

Lastly, under the fourth prong, Thomas and Jennifer contend that Judge White's findings have been undermined by post-termination changes in Robert's placement. In making the prong four determination, however, Judge White appropriately relied on Dr. Loving's expert opinion and testimony that the termination of parental rights would not do the children more harm than good. In reaching his expert opinion, Dr. Loving expressly acknowledged:

> [S]elect home adoption brings a new layer of uncertainty for Robert: both in terms of identifying a prospective adoptive home and also identifying exactly how long it will take for him to join that home. However, even with these concerns in mind, it is my opinion that this is still a safer, healthier, lower-risk option than continuing to pursue reunification with his parents.

We acknowledge that Robert's numerous placements and lack of a clear permanency plan are troubling. Nevertheless, when Judge White made her findings supporting the termination of defendants' parental rights, she was aware that Robert was not in a permanent placement. Accordingly, Judge White appropriately focused on Robert's need for permanency and found that neither Jennifer nor Thomas had the ability to safely parent him at present or in the foreseeable future. Significantly, Judge White found that there was no viable

family-related placement for Robert primarily because Thomas had "scared" those relatives. In short, Judge White's finding that the termination of defendants' parental rights would not do the children more harm than good was based on her findings that both Thomas and Jennifer had significant issues that prevented them from being suitable parents. In making those findings, Judge White relied on Dr. Loving's unrebutted testimony that the termination of both parents' rights was a "safer, healthier, lower-risk option than continuing to pursue reunification with" either Jennifer or Thomas.

2. Defendants Are Not Entitled to Other Relief Under Rule 4:50-1.

Rule 4:50-1 permits a court to grant relief from a final judgment when there are reasons to justify that extraordinary remedy. See In re Guardianship of J.N.H., 172 N.J. 440, 473-74 (2002). Relief under Rule 4:50-1 "should be granted sparingly." Ibid. Our Supreme Court has explained that relief under Rule 4:50-1 is available in a termination of parental rights case, but that the primary focus is on the child's best interests. Id. at 474-75.

The Supreme Court has adopted a two-part test that must be satisfied before a judgment can be reopened. Id. at 473-75; State, Div. of Youth & Fam. Servs. v. T.G., 414 N.J. Super. 423, 434 (App. Div. 2010). First, the moving party must present evidence of changed circumstances. J.N.H., 172 N.J. at 473.

 A-0989-23

Second, the moving party must show that it is in the best interests of the children to set aside the judgment of guardianship.  Id. at 474-75 (where the Court explained that "the notion[s] [of] stability and permanency for the child are paramount").

Neither Jennifer nor Thomas have demonstrated that it is in Robert's best interests to vacate the amended judgment or to remand for a hearing under Rule 4:50-1.  In making our ruling, however, we point out that nothing in this opinion would preclude either Jennifer or Thomas from moving under Rule 4:50-1 if the circumstances concerning Robert's placement continue to be unstable and Robert remains without a viable permanency plan.  In noting that a motion under Rule 4:50-1 could still be raised, we also caution that such a motion should not be brought for some period of time because the Division's guardianship should be focused on achieving permanency for Robert.

In short, the post-termination changes in Robert's placement, although unfortunate, do not undermine the trial court's rationale for concluding that termination would not do him more harm than good.  Accordingly, they do not constitute changed circumstances that would require a remand for reconsideration of the termination decision or other relief under Rule 4:50-1.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0989-23